## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## BROWARD DIVISION

ERIC CARTER MARK SIRACUSE, MICHAEL LINDERMAN, STEPHEN MICHAEL GLASS, JOEY MENDOZA, JULIE DEAKIN, and MICHAEL ZELASKA on behalf of themselves and all others similarly situated,

   Plaintiffs,

  v.

FORD MOTOR COMPANY,

   Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.:

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

## PLAINTIFFS' CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiffs Eric Carter, Mark Siracuse, Michael Linderman, Stephen Michael Glass, Joey Mendoza, Julie Deakin, and Michael Zelaska bring this action against Defendant Ford Motor Company, ("Defendant" or "Ford"), by and through their attorneys, individually and on behalf of all others similarly situated, and alleges as follows:

### INTRODUCTION

1.  This is a class action lawsuit brought by Plaintiffs on behalf of themselves and a class of current and former owners of model year 2015-2019 Ford F-150 XL and XLT vehicles (hereinafter referred to collectively as the "Class

1

Vehicles"). The Class Vehicles were designed, manufactured, marketed and warranted by Defendant. The Class Vehicles contain a defectively manufactured instrument panel initially bearing Part No. FL3Z-1504320-AG (hereinafter referred to as the "Original Dash" or "Original Dashboard").[1]

2.     The Original Dash and subsequent replacement dashboards contain manufacturing defects that make them prone to warping and separation from the vehicle, particularly in the area surrounding the defroster vents (the "Defect"). In multiple cases, the Original Dash and subsequent replacement dashboards have warped and peeled away from the truck body, either prior to sale or mere *weeks* after purchase.

3.     Despite a landslide of complaints regarding this Defect, Defendant refused to address the issue for years. As described below, hundreds of complaints were made specifically about the Defect, which Defendant knew about no later than April 2015. The Plaintiffs also submitted complaints to Defendant's customer service line, and/or to Defendant's agents at authorized Ford dealerships.

4.     In mid-2018, Defendant issued a Special Service Message ("SSM") 472270 to its dealers, which specifically described the Defect and instructed dealerships not to attempt repair. Dealers and Defendant did not, however, disclose

---

[1] Plaintiffs reserve the right to amend or add to the vehicle models included in the definition of Class Vehicles after conducting discovery.

the Defect to customers purchasing a new F-150 even as Ford and Ford dealerships were aware that a substantial number of the Class Vehicles had already manifested the Defect.

5.      On February 15, 2019, Defendant finally released Technical Service Bulletin ("TSB") 19-2041 to Ford dealerships, which calls for replacement of the Original Dash. According to the TSB, the replacement for the Original Dash is a new instrument panel bearing Part No. KL3Z-1504320-SA (the "New Dash" or "New Dashboard"). The New Dashboard, however, also possesses the Defect. The remainder of the parts necessary to install the New Dash are identical to the parts used to install the Original Dash. In other words, Ford has simply replaced one defective dash with another defective dash, failing to address the underlying issue causing the warping and separation, despite Ford's awareness of and access to a proper remedy—installation of the dash used in the Ford F-150's more expensive trim packages.

6.      As noted above, and demonstrated by photographs below, the New Dashboard manifests the same Defect as the Original Dashboard: it warps and separates from the vehicle shortly after installation, frequently at the defroster vent openings. Those that have had the repair completed, such as Plaintiffs Glass and Linderman, have had a recurrence of the warping just weeks after installation.

7.     Defendant, at all times relevant, knew, or through the exercise of reasonable care had reason to know, that the Original Dash contains the Defect. Indeed, as the result of the Defect, Defendant issued TSB 19-2041, and was forced to revise the manufacturing process. However, Defendant knew or should have known that the minimal changes made through TSB 19-2041 would not resolve the Defect, and that the New Dash would fail in the same manner as the Original Dash. This is exactly what has occurred.

8.     As noted above, at all times relevant to this Complaint, Defendant has produced a higher grade dashboard for certain higher level trim F-150 vehicles, such as the Platinum. Upon information and belief,  Platinum dashboards do not contain the Defect. Ford refuses to offer dashboards, free of the Defect, as a replacement to Class Vehicle owners and lessees, even though they are readily available from the higher trim level F-150 vehicles.

9.     On top of providing a defective replacement to certain Plaintiffs, Defendant has failed to provide any replacement to others. Despite its express warranties to cure such manufacturing defects, Defendant has stonewalled many consumers seeking a remedy. Many individuals who have attempted to secure the replacement identified in TSB 19-2041 have been told that either it is on backorder, or that the dealership will not agree to do it at all.

10.     Defendant omitted and/or concealed the existence of the Defect in the Original Dash to increase profits by selling additional Class Vehicles. Knowledge and information regarding the Defect were in the exclusive and superior possession of Defendant and its dealers, and this information was not provided to Plaintiffs and members of the Class.

11.     Based on pre-production testing, pre-sale durability testing, design failure mode analysis, bench testing, warranty and post-warranty claims, consumer complaints on forums monitored (and responded to) by Ford, and consumer complaints made to and by dealers, and directly to Defendant, Defendant was aware of the Defect in the Original Dashboards and the New Dashboards and omitted the existence of and/or fraudulently concealed the Defect from Plaintiffs and members of the Class.

12.     Plaintiffs and members of the Class (and Subclasses) defined below assert claims against Defendant for violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*, breach of express and implied warranties, and violations of consumer statutes in Florida, Illinois, Virginia, and California.

13.     As a direct result of Ford's wrongful conduct, Plaintiffs and members of the Class have been harmed and are entitled to actual damages, including damages for the benefit of the bargain they struck when purchasing their vehicles, the diminished value of their vehicles, statutory damages, attorneys' fees, costs,

restitution, and injunctive and declaratory relief. Specifically, Plaintiffs seek the following potential remedies: immediate installation of dashes at Defendant's expense that do not suffer from the Defect, as well as reimbursement for parts and labor costs incurred by any Class members who paid to have their Original Dash replaced, as well as replacement of any components damaged as the result of the Defect; provision of a temporary replacement vehicle while repair of the Defect is pending; buyback of the Class Vehicles; compensation for any additional sums spent on any repairs to address the Defect; restitution for purchase of extended warranties that will go unused; extended warranties after installation of a non-defective dash; compensation for the loss in value and depreciation of the Class Vehicles; and punitive or other damages for Ford's knowing fraud.

## **JURISDICTION AND VENUE**

14.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different States. This court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 and jurisdiction over the Magnuson Moss Warranty Act claim by virtue of

diversity jurisdiction being exercised under the Class Action Fairness Act ("CAFA").

15.     Defendant sells Class Vehicles through a network of authorized dealers throughout the United States, including in Florida. Defendant purposefully avails itself of the Florida consumer market, distributing vehicles, and disseminating advertising in Florida.

16.     Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims asserted occurred in this District, and Plaintiff Siracuse is domiciled in this District. Venue is also proper in this District because Defendant conducts substantial business in this District, has sufficient minimum contacts with this District, and otherwise purposely avails itself of the markets in this District, through the distribution, promotion, sale, and marketing of their products in this District. Defendant oversees over 100 authorized Ford dealerships in the State of Florida. Accordingly, Defendant has sufficient contacts with this District to subject Defendant to personal jurisdiction in this District and venue is proper.

## **PARTIES**

### **Plaintiff Eric Carter**

17.     Plaintiff Eric Carter is a citizen of Florida. Plaintiff currently resides in Coconut Creek, Florida, and has at all times pertinent to this Complaint.

18.     Plaintiff purchased a new 2019 Ford F-150 XLT on or about June 15, 2019, from Plantation Ford, an authorized Ford dealer and repair center located in Plantation, Florida.

19.     Plaintiff purchased (and still owns) this vehicle, which is used for personal, and/or household use. His vehicle bears Vehicle Identification Number: 1FTEW1E51KKC22990.

20.     Prior to purchase, Plaintiff discussed the features of the vehicle with Ford's sales representatives at Plantation Ford and reviewed the vehicle's window sticker. None of these sources disclosed the defect to Plaintiff.

21.     On or about June 27, 2019, when Plaintiff's vehicle had approximately 600 miles on the odometer, Plaintiff first noticed that Plaintiff's Original Dashboard was manifesting the Defect. Plaintiff noticed the glove compartment was distorted and that the top portion of the dash on the passenger side of the vehicle was warping. The glove box was not fitted properly, showing a tight fit on the sides, and large sag in the middle.  The vehicle was also warping around the defroster vents. The picture below depicts some of the warping of the Original Dashboard of Plaintiff's vehicle:



22.    Plaintiff initially contacted Plantation Ford and informed the service manager of the Defect. The dealership took pictures, they will send complaint and pictures to Ford. They discussed "swapping" the dash, however never disclosed whether it would be the Original Dashboard or the New Dashboard. Through online research, Plaintiff located online forums of many Ford buyers experiencing the same issue and contacted Ford through their website where he filed a report disclosing the defect.

23.     Plaintiff returned a month later and inquired about a fix for his Original Dash. He was told by the service manager that there is nothing they can do and are waiting for Ford to issue a recall.

24.     As of October 23, 2019, Plaintiff has yet to hear back from Ford Motor Company, a representative of Plantation Ford.

25.     Plaintiff Eric Carter has suffered an ascertainable loss as a result of Defendant's omissions associated with the Defect, including, but not limited to, out of pocket loss associated with the Defect and diminished value of his vehicle.

26.     Neither Defendant, nor any of its agents, dealers or other representatives informed Plaintiff of the existence of the Defect in the Original Dash prior to purchase. Had Defendant disclosed the defect to Plaintiff, Plaintiff would not have purchased his vehicle, or would have paid less for it.

**Plaintiff Mark Siracuse**

27.     Plaintiff Mark Siracuse is a citizen of Florida. Plaintiff currently resides in Key West, Florida, and has at all times pertinent to this Complaint.

28.     Plaintiff purchased a new 2018 Ford F-150 XLT on or about November 24, 2018, from Bill Jarrett Ford, an authorized Ford dealer and repair center located in Avon Park, Florida.

29.     Plaintiff purchased (and still owns) this vehicle, which is used for personal, and/or household use. His vehicle bears Vehicle Identification Number: 1FTEW1EW1EG7JFE74087.

30.     Prior to purchase, Plaintiff discussed the features of the vehicle with Ford's sales representatives at Bill Jarrett Ford and reviewed the vehicle's window sticker. None of these sources disclosed the defect to Plaintiff.

31.     On or about January 7, 2019, when Plaintiff's vehicle had approximately 1,771 miles on the odometer, Plaintiff first noticed that Plaintiff's Original Dash was manifesting the Defect. Plaintiff was cleaning his vehicle when he noticed the top portion of the dash on the passenger side of the vehicle was warping. As a result of the warping, the glove box was not fitted properly, showing a tight fit on the sides, and large sag in the middle.  The picture below depicts some of the warping of the Original Dashboard of Plaintiff's vehicle:



32.     Plaintiff initially contacted Bill Jarrett Ford and informed the salesman of the Defect. Initially, the dealership refused to make any effort to repair the Defect, claiming it was not covered under warranty, and was considered "cosmetic." Next, Plaintiff completed a Ford survey describing the issue and giving the dealership a poor rating. Subsequently, Plaintiff was contacted by Bill Jarrett Ford and informed the repair would cost thousands of dollars but that the dealership was willing to split the cost with Plaintiff. Plaintiff declined as he believed that it was unreasonable for him to shoulder the cost on a new vehicle well within warranty. Plaintiff then brought the vehicle to his local Ford dealership (Keys Auto Center located at 1618 N.

Roosevelt Blvd. in Key West, Florida) and submitted a request for warranty repair. Keys Auto Center later informed Plaintiff that, "Ford acknowledged the problem and is still investigating condition and repair procedure. No fix at this time."

33.     Following the warranty response from Ford, Plaintiff was regularly in contact with Bill Jarrett Ford, who eventually agreed to cover the full cost of the repair but informed Plaintiff that there was no solution to the Defect, as a replacement dashboard would only warp again. Through online research, Plaintiff located online forums of many Ford buyers experiencing the same issue. Plaintiff was later informed there was a new replacement dashboard available. But, as discussed below, the experience of Plaintiffs Glass, Linderman and others demonstrate that the New Dashboard is subject to the same Defect.

34.     Plaintiff Mark Siracuse has suffered an ascertainable loss as a result of Defendant's omissions associated with the Defect, including, but not limited to, out of pocket loss associated with the Defect and/or diminished value of his vehicle.

35.     Neither Defendant, nor any of its agents, dealers or other representatives informed Plaintiff of the existence of the Defect in the Original Dash prior to purchase. Had Defendant disclosed the defect to Plaintiff, Plaintiff would not have purchased his vehicle, or would have paid less for it.

**Plaintiff Michael Linderman**

36.     Plaintiff Michael Linderman is a citizen of Florida. Plaintiff currently resides in Winter Haven, Florida, and has at all times pertinent to this Complaint.

37.     Plaintiff purchased a new 2018 Ford F-150 XLT on or about May 18, 2018, from Brandon Ford, an authorized Ford dealer and repair center located in Brandon, Florida.

38.     Plaintiff purchased (and still owns) this vehicle, which is used for personal, and/or household use. His vehicle bears Vehicle Identification Number: 1FTEX1CP0JKD00580.

39.     Prior to purchase, Plaintiff discussed the features of the vehicle with Ford's sales representatives at Brandon Ford and reviewed the vehicle's window sticker. None of these sources disclosed the defect to Plaintiff.

40.     Shortly after his purchase, when Plaintiff's vehicle had only approximately 118 miles on the odometer, Plaintiff first noticed that his Original Dash was manifesting the Defect. The Original Dash was peeling up and bowing. The picture below depicts some of the warping of the Original Dashboard of Plaintiff's vehicle:



41.    Upon noticing the Defect, Plaintiff initially contacted Winter Haven Ford. Winter Haven Ford indicated that they were unaware of the issue. Winter Haven Ford then reported to Plaintiff that the dealership reached out to Defendant. Defendant indicated to the dealership that no fix was available. Plaintiff also communicated repeatedly with Winter Haven Ford and Defendant, expressing disappointment about the Defect and requesting a repair under his warranty.

42.    Months later, as Plaintiff Linderman noticed that the Defect was only worsening, he reached back out to Defendant. Defendant finally indicated a fix was available. Plaintiff scheduled a repair pursuant to TSB 19-2041. In March 2019–after losing use of his truck for 10 days—Plaintiff received his Class Vehicle back, with the New Dash installed. As depicted in the photo below, within two weeks the Defect manifested again.



43.     Plaintiff Linderman has suffered an ascertainable loss as a result of Defendant's omissions associated with the Defect, including, but not limited to, out of pocket loss associated with the Defect and diminished value of his vehicle.

44.     Neither Defendant, nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the Defect in the Original (or New) Dash prior to purchase. Had Defendant disclosed the defect to Plaintiff, Plaintiff would not have purchased his vehicle, or would have paid less for it.

**Plaintiff Stephen Michael Glass**

45.     Plaintiff Stephen Michael Glass is a citizen of Florida.  Plaintiff currently resides in Avon Park, Florida, and has at all times pertinent to this Complaint.

46.     Plaintiff purchased a new 2018 Ford F-150 XLT on or about March 31, 2019, from Alan Jay Ford, an authorized Ford dealer and repair center located in Sebring, Florida.

47.     Plaintiff purchased (and still owns) this vehicle, which is used for personal, family and/or household use.  His vehicle bears Vehicle Identification Number: 1FTEX1CG6JFB02613.

48.     Prior to purchase, Plaintiff discussed the features of the vehicle with Ford's sales representatives at Alan Jay Ford and reviewed the vehicle's window sticker. None of these sources disclosed the defect to Plaintiff.

49.     On or about April 25, 2019, when Plaintiff's vehicle had approximately 2,572 miles on the odometer, Plaintiff was cleaning the front windshield while washing his truck and observed that Plaintiff's Original Dash was manifesting the Defect.

50.     After becoming aware of the Defect in his vehicle, Plaintiff reached out to the service department of Alan Jay Ford about his warping Original Dash. Subsequently, Plaintiff took his vehicle into the service department for visual inspection. The service department acknowledged the warping and said they would send pictures to Ford, and order a New Dash upon approval. The service department took pictures of the Original Dash and indicated that it would take approximately six weeks to receive the New Dash, which was accurate.

51.     Between June 10-18, 2019, Plaintiff's dealership completed the installation of the New Dash pursuant to Plaintiff's bumper-to-bumper warranty. Several weeks after installation, Plaintiff noticed that the New Dash was warping. The arrows in the picture below depict the presence of the Defect in the New Dash:



52.     Plaintiff brought the manifestation of the Defect in the New Dash to his service advisor at Alan Jay Ford and requested warranty coverage. The service advisor denied warranty coverage and offered no solution. Plaintiff also contacted Ford national customer service, complaining that the New Dash also suffered the Defect, warping in the same fashion and in approximately the same location that the Original Dash. Plaintiff again requested warranty coverage. Upon learning of the manifestation of the Defect in the New Dash, Ford responded by saying that Plaintiff needed to bring it into the dealership. When Plaintiff brought the vehicle back to the

dealership, the service advisor at Alan Jay Ford said that another replacement would be pointless because any replacement would also warp and that the vehicle could develop rattles that the dealership would be unable to repair.

53.    Plaintiff Glass has suffered an ascertainable loss as a result of Defendant's omissions associated with the Defect, including, but not limited to, out of pocket loss associated with the Defect and diminished value of his vehicle.

54.    Neither Defendant, nor any of its agents, dealers or other representatives informed Plaintiff of the existence of the Defect in the Original Dash prior to purchase. Had Defendant disclosed the defect to Plaintiff, Plaintiff would not have purchased his vehicle, or would have paid less for it.

**Plaintiff Joey Mendoza**

55.    Plaintiff Joey Mendoza is a citizen of California.  Plaintiff currently resides in Anaheim, California, and has at all times pertinent to this Complaint.

56.    Plaintiff leased a new 2018 Ford F-150 XLT on or about May 26, 2018, from Citrus Ford, an authorized Ford dealer and repair center located in Ontario, California.

57.    Plaintiff leased (and still owns) this vehicle, which is used for personal, family and/or household use.  His vehicle bears Vehicle Identification Number: 1FTEW1CP3JKD34886.

58.    Prior to purchase, Plaintiff discussed the features of the vehicle with Ford's sales representatives at Citrus Ford and reviewed the vehicle's window sticker. None of these sources disclosed the Defect to Plaintiff.

59.    On or about August or September of 2018, when Plaintiff's vehicle had approximately 3,000 miles on the odometer, Plaintiff first noticed that Plaintiff's Original Dash was manifesting the Defect.  At that time, Plaintiff noticed that the Original Dash was warped and creaking or rattling as the result of multiple locations on the dashboard where there were gaps between material joints.  Additionally, the top of the dashboard by the defroster vents began to bubble up and warp.  The picture below depicts some of the warping of the Original Dashboard of Plaintiff's vehicle:



60.     Subsequently, Plaintiff repeatedly inquired with Citrus Ford about the Defect and sought repair under his warranty. The service department refused each such request.

61.     On or about February 15, 2019, Plaintiff called Ford's national customer service line and requested warranty coverage and was told that there was no fix. Ford refused to repair the Original Dash under the terms of Defendant's warranty.

62.     Plaintiff later learned that TSB 19-2041 was released prior to his call to Ford's national customer service line.  After a service advisor at Citrus Ford initially

dismissed Plaintiff's request for repair of the Defect, and a subsequent service advisor also politely dismissed Plaintiff's warranty repair request, Plaintiff raised the TSB with him on May 20, 2019.  Plaintiff was then told that the parts were on a three week back order.  After receiving no updates, Plaintiff called to inquire on August 20, 2019 and was informed that Plaintiff was number four on a queue of 12 customers. No timeline for repair was offered.  In the interim, Plaintiff has learned that the TSB does not even address the underlying Defect and that warping reoccurs even with the New Dashboard replacement.

63.    Plaintiff Mendoza has suffered an ascertainable loss as a result of Defendant's omissions associated with the Defect, including, but not limited to, out of pocket loss associated with the Defect and diminished value of his vehicle.

64.    Neither Defendant, nor any of its agents, dealers or other representatives informed Plaintiff of the existence of the Defect in the Original Dash prior to purchase.  Had Defendant disclosed the defect to Plaintiff, Plaintiff would not have purchased his vehicle, or would have paid less for it.

**Plaintiff Julie Deakin**

65.    Plaintiff Julie Deakin is a citizen of Illinois.  Plaintiff currently resides in East Peoria, Illinois, and has at all times pertinent to this Complaint.

66.     Plaintiff purchased a new 2018 Ford F-150 XLT on or about June 21, 2018, from Uftring Automall, an authorized Ford dealer and repair center located in East Peoria, Illinois.

67.     Plaintiff purchased (and still owns) this vehicle, which is used for personal, family and/or household use. Her vehicle bears Vehicle Identification Number: 1FTEW1EG8JKCF8215.

68.     Prior to purchase, Plaintiff discussed the features of the vehicle with Ford's sales representatives at Uftring Automall and reviewed the vehicle's window sticker. None of these sources disclosed the defect to Plaintiff.

69.     On or about September 13, 2018, when Plaintiff's vehicle had approximately 5,429 miles on the odometer, Plaintiff first noticed that Plaintiff's Original Dash was manifesting the Defect. As depicted in the picture below, Plaintiff noticed buckling at the defrost vent area and a large bump located in the area of the passenger side air bag location near the defrost vent.



70.    Shortly after discovering the Defect, Plaintiff spoke with the service department at Uftring Automall and requested warranty coverage. Initially, Plaintiff was informed that Ford was aware of the issue and working to identify a solution. Periodically, Plaintiff checked with the service department at Uftring Automall, and they continued to indicate that Ford was still searching for a solution.

71.    On November 28, 2018, Plaintiff spoke with the lead service manager at Uftring Automall who took pictures of the Original Dash in locations where it possessed visible warping.  He printed off SSM 47270, an order notification from Ford Motor Company, which stated "do not attempt to repair at this time effective date of April 30, 2018."

72.    As a result, it became clear to Plaintiff that Defendant and Uftring Automall were aware of the Defect prior to her purchase in June 2018.

73.    On January 11, 2019, Plaintiff contacted Ford's national customer service line and explained the situation with her vehicle. Plaintiff was given case number CAS16849558.  Plaintiff called again on August 23, 2019 and was told that Ford no longer had record of her case number, so Plaintiff was provided a new case number of CAS24073669. Plaintiff was also informed that within six to eight weeks, Uftring Automall would receive a New Dash. However, Plaintiff has since learned that the New Dash also suffers from the Defect.

74.     Plaintiff Deakin has suffered an ascertainable loss as a result of Defendant's omissions associated with the Defect, including, but not limited to, out of pocket loss associated with the Defect and diminished value of her vehicle.

75.     Neither Defendant, nor any of its agents, dealers or other representatives informed Plaintiff of the existence of the Defect in the Original Dash prior to purchase. Had Defendant disclosed the defect to Plaintiff, Plaintiff would not have purchased her vehicle, or would have paid less for it

**Plaintiff Michael Zelaska**

76.     Plaintiff Michael Zelaska is a citizen of Virginia. Plaintiff currently resides in Woodbridge, VA, and has at all times pertinent to this Complaint.

77.     Plaintiff purchased a new 2018 Ford F-150 XLT on or about September 23, 2018, from Ted Britt Ford, an authorized Ford dealer and repair center located in Fairfax, VA.

78.     Plaintiff purchased (and still owns) this vehicle, which is used for personal, family and/or household use.  His vehicle bears Vehicle Identification Number: 1FTEW1E58JFE24779.

79.     Prior to purchase, Plaintiff discussed the features of the vehicle with Ford's sales representatives at Ted Britt Ford and reviewed the vehicle's window sticker. None of these sources disclosed the defect to Plaintiff.

25

80.   On or about December 27, 2018, when Plaintiff's vehicle had approximately 6,838 miles on the odometer, Plaintiff first noticed that Plaintiff's Original Dash was manifesting the Defect. Plaintiff set a document on the Original Dash and noticed that it was not lying flat. Upon further research, Plaintiff learned that the Defect was a widespread issue with his model of F-150. The picture below depicts warping in Plaintiff's Original Dash:



81.   Plaintiff visited Cowles Parkway Ford, located in Woodbridge, VA, on December 27th, 2018, to inquire about repair/replacement pursuant to his warranty. The dealership acknowledged the problem, documented it, and identified SSM 47270, which stated that dealerships should not attempt a repair at that time. The

dealership took down Plaintiff's information and advised him that they would reach out when a repair was available.

82.     After the dealership advised Plaintiff that there was no repair, Plaintiff also contacted Ford's national customer service line to report the Defect and request a repair pursuant to his warranty. Plaintiff spoke with Ford customer representative Shaskisha Garcia on or about January 25, 2019, who advised him that there was no repair at that time. Plaintiff requested to have his case escalated to a manager several times. Plaintiff's request was refused, with one customer service representative stating that "it would not make a difference." Plaintiff then requested the Regional Customer Service Representative's contact information. This request was also refused. The customer service representative then advised Plaintiff that the Regional Customer Service Representative would reach out to him. Plaintiff was never contacted. Plaintiff was finally given case number CAS-16935740 and advised that his case would be marked inactive, and that a dealership would reach out to him when a repair was made available.

83.     Neither the dealership, nor Ford's national customer service line, contacted Plaintiff regarding this issue since TSB 19-2041 was released.

84.     On August 23, 2019, Plaintiff took his truck back to Cowles Parkway Ford to inquire about the repair identified in TSB 19-2041. The dealership again acknowledged the problem, took photographs and confirmed that they would replace

the Original Dash once Ford approved the warranty claim. After several weeks without updates, Plaintiff reached out to Cowles Ford again on September 6, 2019. The dealership informed Plaintiff that the parts were on a national backorder, and they did not have a timeframe for repair to provide.

85.    Plaintiff Michael Zelaska has suffered an ascertainable loss as a result of Defendant's omissions associated with the Defect, including, but not limited to, out of pocket loss associated with the Defect and diminished value of his vehicle.

86.    Neither Defendant, nor any of its agents, dealers or other representatives informed Plaintiff of the existence of the Defect in the Original Dashboard prior to purchase. Had Defendant disclosed the defect to Plaintiff, Plaintiff would not have purchased his vehicle, or would have paid less for it.

**<u>Defendant</u>**

87.    Defendant Ford Motor Company is a Delaware limited liability company with its principal place of business located at 1 American Road, Dearborn, Michigan 48126. Ford Motor Company designs, manufactures, promotes and sells motor vehicles, component parts and other products for sale throughout the United States and the world, including the F-150 vehicles at issue in this litigation.

88.    At all times relevant to this action, Defendant and/or its agents manufactured, distributed, sold, leased, and warranted the Class Vehicles throughout the United States. Defendant and/or its agents manufactured, and/or installed the

28

Original and New Dash that suffered from the Defect in the Class Vehicles. Defendant and/or its agents also developed and disseminated the owner's manuals, warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles.

## FACTUAL ALLEGATIONS

### A. The Dashboard Defect

89.    Ford designs, engineers, manufactures and sells vehicles in this District and throughout the United States through its network of authorized motor vehicle dealers.

90.    Ford's F-Series truck has been the best-selling vehicle in the United States for 37 years. The F-Series maintains a dominant market share, representing nearly one-third of all pickup trucks sold in the United States, and leading as America's best selling truck for four decades. Ford sold over 896,000 F-Series trucks in the United States in 2017, and over 909,000 in 2018. Worldwide, an F-Series truck is sold every 29.3 seconds.

91.    The F-Series has been immensely profitable for Ford. As of 2018, approximately $50 billion dollars of Ford's annual $160 billion in sales come from the sale of the F-Series truck alone. To put this in context, reporting indicates that if the Ford F-Series was its own Fortune 500 company, it would exceed the annual revenue of behemeths such as Oracle, American Express, and Best Buy.

92.     The 2015-2019 Ford F-Series trucks are the thirteenth generation of the

F-Series. The trim levels and years include the following:

| Production Years | Trim Level |
|---|---|
| 2015—Present | XL |
| 2015—Present | XLT |
| 2015—Present | Lariat |
| 2015—Present | King Ranch |
| 2015—Present | Platinum |
| 2016—Present | Limited |
| 2017—Present | Raptor |

93.     The popular F-Series truck is costly, averaging nearly $47,000 per

vehicle, although the trim level price range is significant. The trucks run from

approximately $30,000 for the most basic entry level XL to over $67,000 for a well-

equipped Raptor.

94.     As noted in paragraph 1, *supra*, this case concerns the XL and XLT

trim levels, which generally comprise the lower price range of the F-Series.

95.     The Defect appears to only present in the XL and XLT trim levels of

the Ford F-150. Consumers that have installed the higher end Lariat/Platinum

dashboard[2] have reported no warping.

---

[2] *See* Ridgebacks. "Lariat/Platinum Dash Install XLT." [Msg 1]. FORD F150
FORUM (Feb. 25, 2017 06:34 PM), https://www.f150forum.com/f118/lariat-
platinum-dash-install-xlt-374174/ (last checked September 18, 2019).

96.     Defendant is well aware that the substandard materials utilized in the XL and XLT Original and New Dash are prone to warping. Defendant nevertheless persists in refusing to provide a higher quality dashboard that Defendant knows will remedy the problem in the Class Vehicles.

97.     Upon information and belief, during the relevant time period the Class Vehicles included the Original Dash, which bears Part No. FL3Z-1504320-AG. The pictures in TSB 19-2041 demonstrate the warping at issue.

*Figure 1*



*Figure 2*



98.     The warping represented in TSB 19-2041 is ubiquitous throughout the Class Vehicles. By some accounts, the majority of unsold Class Vehicles on Ford lots have manifested the Defect.[3]

## B. Defendant's Knowledge of the Defect

*Knowledge from Consumer Complaints*

99.     Defendant has had knowledge of the Defect since at latest April of 2015. Consumer complaints to dealers and Defendant began shortly after the 2015 F-150 was released. From March to August of 2015, for example, dozens of individuals documented the Defect in a prominent F-150 website (www.f150forum.com), including photographs of the defects. Multiple individuals reported discussing the problem with their dealerships or Defendant directly, and

---

[3] *See, e.g.*, complaints on pages 32, 43 *infra*.

being told that no fix was possible. Example posts are included below.

100.   Defendant regularly reviewed this F-150 forum. Indeed, as early as April 2015, an account from the username FordService based in Dearborn, Michigan responded to customer complaints about the Original Dashboard—including complaints that made clear that the Defect was rampant in unsold vehicles on the dealership lots—noting the Complaints would be relayed to regional customer service managers.[4]

| Post Date | Username | Post Content |
|---|---|---|
| 03-25-2015 | nix150 | 2015 Dash Warp?<br>Um, wondering if anyone has seen this on their truck. The dash molding up by the defrost vents is deforming a bit on both driver and passenger sides. It's causing a small clipped in plastic part to separate from where it's supposed to be flush. Sorry for the picture quality but it was quick. Bad lighting but you should be able to see what I'm talking about. Im getting concerned with all these little issues. I kinda want my old truck back...[5] |

---

[4] FordService. "2015 Dash Warp?" [Msg 12]. FORD F150 FORUM (Apr. 10, 2015, 09:49 AM),  https://www.f150forum.com/f118/2015-dash-warp-295214/index2/

[5] Nix150. "2015 Dash Warp?" [Msg 1]. FORD F150 FORUM (Mar. 25, 2015, 08:01 PM),  https://www.f150forum.com/f118/2015-dash-warp-295214/.

| | | |
|---|---|---|
| | |  |
| 04-18-2015 | Urbandaddy | Here is my dash, minor lifting on passenger side. Nothing on driver side.[6] |

---

[6] UrbanDaddy. "2015 Dash Warp?" [Msg 24]. FORD F150 FORUM (Apr.18, 2015, 12:27 PM),  https://www.f150forum.com/f118/2015-dash-warp-295214/index3/

| | | |
|---|---|---|
| | |  |
| 05-06-2015 | VinceNC | My truck has the same problem. Noticed it yesterday while cleaning the dash. The problem is (in my opinion )is the plastic is too thin and even if it 8s replaced it will just do it again. After finding it I started press g on the dash 8n different places, the entire dash is super thin plastic. Thin black plastic and hot sun, you do the math. I just can believe they made the dash material so thin. I paid almost 45000.oo dollars for my truck and to find how thin the dash material is really upsets me. I will not let them pull my dash until there is a permanent fix. But like others have said I can't stop looking at it. Really upsetting.[7] |
| 05-21-2015 | sixsax88 | I noticed mine has a small warp spot a couple days into ownership. After a month it has gotten a little worse, and we haven't had a day over 80 degrees yet. Im stressing about how it will hold up in 100 degree temps. My dealer looked at it a few days ago and said "theres nothing we |

---

[7] VinceNC. "2015 Dash Warp?" [Msg 28]. FORD F150 FORUM (May 6, 2015, 12:22 AM), https://www.f150forum.com/f118/2015-dash-warp-295214/index4/

| | | |
|---|---|---|
| | | can do right now". 5 issues in about 3 weeks...im losing confidence in the truck and buyers remorse has set in hard. Its bad enough listening to the wife harp on me for spending 55k, but i can't handle her yelling each time i have to take it in to the dealer. Im having a hard time living down the "i told you so's".[8] |
| 07-22-2015 | fliersguy | Warped on both sides of mine, driver and passenger.[9] |
| 07-22-2015 | lariatChariot | Default XLT only?<br>I checked this out today at a dealer. All the XLTs had it. The dash is thin and very flexible, and nearly flat. No wonder it is distorting. They need to redesign the parts with some stiffening webs underneath.<br><br>The sales guy had "no idea" what problem I was investigating and "hasn't heard a thing about it". However, both XLT dashes I looked at were covered with fingerprints in that area.<br><br>None of the Lariats I looked at had the issue. The dash in the subject area is quite different on Lariat and above trims. It has about a 1/2" step down to accommodate the thick pad. Both features, the step and the pad itself, stiffen the assembly. It does flex, but is much, much harder to distort by hand than the flimsy XLT.<br><br>I didn't see any XLs.<br><br>It would be helpful if people list their particulars when describing problems.[10] |
| 07-29-2015 | Dang_Ole_Rob | Had to create an account just to say I'm having this same issue with my XLT on the passenger side. Just noticed it |

---

[8] Sixsax88. "2015 Dash Warp?" [Msg 60]. FORD F150 FORUM (May 2, 2015, 09:49 AM),  https://www.f150forum.com/f118/2015-dash-warp-295214/index6/

[9] Fliersguy. "2015 Dash Warp?" [Msg 67]. FORD F150 FORUM (Jul. 22, 2015, 12:32 AM),  https://www.f150forum.com/f118/2015-dash-warp-295214/index7/

[10] lariatChariot. "2015 Dash Warp?" [Msg 69]. FORD F150 FORUM (Jul. 22, 2015, 08:07 PM),  https://www.f150forum.com/f118/2015-dash-warp-295214/index7/

| | | |
|---|---|---|
| | | after I left service to get the doors realigned. I guess ill be back there tomorrow.[11] |
| 08-01-2015 | Papaya | Dash warp! I hate reading in forums! After reading this, I had to checkout my dashboard. Mine has 3 waves! Now I have to open a case too. I can't believe this. Ford can't make anymore good quality vehicles.[12] |
| 08-04-2015 | AtlasPilot | Had to make an account because I noticed this happening to my passenger side today. 10k miles 2015 Screw XLT w/nav. I think the nav has a different dash, that's why I mention it. I'm hesitant to even waste the time bringing it in because I didn't think the dealer would fix it anyway. I would have to have my wife bring it in anyway so they would treat her like crap.[13] |
| 08-05-2015 | gm125800 | Just noticed my warped dash as well. I've only had it for 15 days. 2015 XLT Super crew with black dash[14] |
| 08-07-2015 | Papaya | I made some pictures for members who are thinking to get a 2015 F150. Only saying. Check them out on the lot before you buy.[15] |

---

[11] Dang_Ole_Rob. "2015 Dash Warp?" [Msg 74]. FORD F150 FORUM (Jul. 29, 2015, 04:27 PM), https://www.f150forum.com/f118/2015-dash-warp-295214/index8/
[12] Papaya. "2015 Dash Warp?" [Msg 76]. FORD F150 FORUM (Aug. 1, 2015, 11:26 AM), https://www.f150forum.com/f118/2015-dash-warp-295214/index8/
[13] AtlasPilot. "2015 Dash Warp?" [Msg 89]. FORD F150 FORUM (Aug. 4, 2015, 10:55 PM), https://www.f150forum.com/f118/2015-dash-warp-295214/index9/
[14] Gm125800. "2015 Dash Warp?" [Msg 90]. FORD F150 FORUM (Aug. 5, 2015, 08:52 PM), https://www.f150forum.com/f118/2015-dash-warp-295214/index9/
[15] Papaya. "2015 Dash Warp?" [Msg 93]. FORD F150 FORUM (Aug. 7, 2015, 01:28 PM), https://www.f150forum.com/f118/2015-dash-warp-295214/index10/



| | | |
|---|---|---|
| 08-28-2015 | Hobbs62 | Well my xlt sport dash is warped in the center. Reminds me of the last dodge dash that cracked in the first couple years of the new generation. I will be honest, if I would have read this forum before buying I would have never bought this truck. Manufactures should put their money where their mouth is and warranty bumper to bumper for |

| | | the life of your loan. If I'm having to pay high new car payments for 6 years they should back it for 6 years.[16] |
|---|---|---|

*Knowledge Through Quality Control and Design Tests*

101. Defendant failed to adequately research, design, test and/or manufacture the Dashboards in the Class Vehicles before warranting, advertising, promoting, marketing, and/or selling the Class Vehicles for use in patently foreseeable environmental conditions.

102. Defendant is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, Defendant conducts tests, including pre-sale durability testing, on incoming components, including, upon information and belief, the dashboards of its vehicles, to verify the parts are free from defect and align with Defendant's specifications and intended use of the Class Vehicles. Defendant refers to this system as the global Quality Operating System, which is designed to "ensure that our vehicles meet or exceed competitive and performance targets, as well as customer expectations, throughout their development and manufacture." *See* Ford Sustainability Report 2018/2019, available at https://corporate.ford.com/microsites/sustainability-report-2018-19/assets/files/sr18.pdf

---

[16] Hobbs62. "2015 Dash Warp?" [Msg 135]. FORD F150 FORUM (Aug. 28, 2015, 09:50 AM),  https://www.f150forum.com/f118/2015-dash-warp-295214/index14/

103.    Further, Defendant performs a comprehensive four-part durability evaluation on its vehicles before they are released for sale to the general public. The four steps are a virtual analysis, data acquisition, bench testing, and road testing.

104.    The virtual analysis stage is conducted by Ford engineers. It is designed to identify risk areas early in the development process by using software simulations to identify potential part failures by using advanced mathematical models. This process allows Ford to identify and correct any issues with its vehicles before they are produced and when it is the least costly to remedy.

105.    The data acquisition stage is also conducted by Ford engineers. Ford engineers collect and analyze road load data (data regarding the expected load the vehicles will undergo during their anticipated lifetime).

106.    Bench testing involves testing individual components of the vehicle to simulate real world conditions. Bench testing is designed to verify the overall soundness of a component under controlled conditions. The testing performed typically includes testing various component parts to failure.

107.    Through a variety of quality control metrics, Ford knew or should have known of the Defect in the Original Dash of the Class Vehicles prior to and shortly after the time of sale to Class members.

108.    Consumers have incurred and will continue to incur expenses for replacement of the defective Original Dash, should they desire a permanent fix,

because the New Dash does not resolve the Defect. This is so despite Defendant's plain knowledge—for years—of a latent defect contained in the Class Vehicles manufactured by Defendant.

109.   Upon information and belief, Defendant, through (1) its own records of customers' complaints, (2) dealership repair records, (3) warranty and post-warranty claims, (4) internal pre-sale durability testing and internal investigations (sometimes referred to as "star" reports), and (5) a variety of other sources, including the F-150 forum referenced above, was well aware of the Defect.

110.   Despite Defendant's knowledge of the Defect, it failed to notify customers of the nature and extent of the problems with Class Vehicles or provide any adequate remedy. Instead, it has failed to take action to properly remedy the Defect, providing a New Dash that has the same Defect, or refusing to provide repairs or replacements at all. Defendant continued to sell, and continues to sell, Class Vehicles with the Defect through its authorized dealers all over the United States.

## C. **Ford's Warranties Related to the Defect**

111.   The Class Vehicles come with a three-year/36,000 mile Bumper-to-Bumper Limited Warranty. The Bumper-to-Bumper Limited Warranty lasts for three years from the date the Class Vehicle is received, or for 36,000 miles on the odometer, whichever occurs first.

112.    For each model year Class Vehicle, under the terms of the Bumper-to-Bumper Limited Warranty, Ford agreed to "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship."[17]

113.    Ford instructs vehicle owners and lessees to bring their vehicles to a Ford dealership for the warranty repairs. Ford instructs these liscenced dealers regarding the nature and type of repairs that may be made. Ford's dealers thereby act as its agents in making sales of its vehicles to consumers, receiving complaints

---

[17] *See* Ford Motor Company. *2015 Model Year Ford Warranty Guide*. (July 2014), available at
http://www.linkmotors.com/brochures/2015_Ford_Warranty_Guide.pdf ; Ford Motor Company. *2016 Model Year Ford Warranty Guide*. (Oct. 2015), available at https://www.ford.com/cmslibs/content/dam/brand_ford/en_us/brand/resources/general/pdf/brochures/2016-Car-Lt-Truck-Warranty-version-3_frdwa_EN-US_10_2015.pdf ; Ford Motor Company. *2017 Model Year Ford Warranty Guide*. (Aug. 2016), available at http://www.fordservicecontent.com/Ford_Content/Catalog/owner_information/2017-Ford-Car-LT-Truck-Warranty-version-3_frdwa_EN-US_03_2018.pdf; Ford Motor Company. *2018 Model Year Ford Warranty Guide*. (Aug. 2017), available at https://www.ford.com/cmslibs/content/dam/brand_ford/en_us/brand/resources/general/pdf/warranty/2018-Ford-Car-Lt-Truck-Warranty-version-3_frdwa_EN-US_08_2017.pdf; Ford Motor Company. *2019 Model Year Ford Warranty Guide*. (Apr. 2019), available at https://www.ford.com/cmslibs/content/dam/brand_ford/en_us/brand/resources/general/pdf/warranty/2019-Ford-Car-Truck-Warranty-version-1_frdwa_EN-US_04_2018.pdf.

regarding the Defect, and addressing (or failing to address) requests for repairs and replacements pursuant to the warranty.

114.   Many owners and lessees have presented Class Vehicles directly to Defendants, and / or their agents at Ford dealerships, with complaints related to the Defect.

115.   Despite the Defect having been contained in the Class Vehicles when manufactured by Defendant, in many instances, the customer service departments claim to be unaware of the issue, explain that there is a backorder, or inform consumers that they will be forced to cover the costs of repairs and related expenses.

### D. Complaints by Other Class Members

116.   A flood of complaints from consumers that purchased or leased Class Vehicles exist and have been documented online. As discussed above, many of these complaints are in forums that are in fact monitored by Ford.

117.   Below are examples of consumer complaints made on just two websites that Ford habitually monitors:

### Ford F150 Forum

| 08-28-2015 | K.jfitz | Mine is growing a hump on the passenger side. I'm thinking this is a material and design issue. I'm wondering if I should bring it up or just hope it doesn't get worse. Truck is only a couple weeks old. Dang.[18] |
|---|---|---|

---

[18] K.jfitz. "2015 Dash Warp?" [Msg 139]. FORD F150 FORUM (Aug. 28, 2015, 06:28 PM), https://www.f150forum.com/f118/2015-dash-warp-295214/index14/

| 09-11-2015 | TX15XLT | might as well chime in i JUST noticed my dash is starting to warp on drivers side just like everyone elses mine is XLT built in june bought first part of august...[19] |
| --- | --- | --- |
| 09-11-2015 | hunter306 | my passenger side is bubbled for sure, I'm watching this thread-- It doesn't seem like a permanent fix has been achieved.[20] |
| 09-20-2015 | IRon Trini | **passenger side warping**<br><br>I discovered this this morning. I only had the truck less than two weeks[21]<br><br> |

---

[19] TX15XLT. "2015 Dash Warp?" [Msg 158]. FORD F150 FORUM (Sep. 11, 2015, 02:54 PM), https://www.f150forum.com/f118/2015-dash-warp-295214/index16/
[20] hunter306. "2015 Dash Warp?" [Msg 159]. FORD F150 FORUM (Sept. 11, 2015, 02:56 PM), https://www.f150forum.com/f118/2015-dash-warp-295214/index16/
[21] IRon Trini. "2015 Dash Warp?" [Msg 187]. FORD F150 FORUM (Sep. 20, 2015, 03:57 PM),  https://www.f150forum.com/f118/2015-dash-warp-295214/index19/

| | | |
|---|---|---|
| 10-01-2015 | JMF150 5.0 | I just looked at my 2015 F150 and i seem to have this issue too, but it seems to follow the center console edges. I had another 1st gen car that had to have the Dash removed and the dealer never put it back in place correctly so Im not sure if I will have this one fixed.[22] |
| 10-09-2015 | DNovello | So really there's no reason for me to post my story but I liked my truck so much I searched online to see what other owners didn't like last week and came across this forum only to read about the warped dashboard I have a 2015 xlt 4x4 sport got it August 28th. So after reading this I looked at my dash and sure enough warped on both sides of the tray on the dash called Danvers ford in Danvers Massachusetts where I got the vehicle and got |

---

[22] JMF150 5.0. "2015 Dash Warp?" [Msg 235]. FORD F150 FORUM (Oct. 1, 2015, 03:45 PM), https://www.f150forum.com/f118/2015-dash-warp-295214/index24/

| | | |
|---|---|---|
| | | told to bring it in for pictures today after work. Of course they said they hadn't seen this problem yet there but I looked through the lot and all xlts and lariats with plastic dash had this problem and I told them one of the mechanics said if it was designed right they would of put a clip in that spot and claimed it must of been from turning on the defrost. I haven't even used the defrost yet because it's been fairly warm here iv had the truck just over a month. Anyway waiting for ford to call the dealer back with a plan. Just wondering for those who have switched out the dash how did it come out and for the ones that had those plastic pieces replaced instead of the dash how did that come out? Any pictures?[23] |
| 01-20-2016 | antho | Noticed my passenger side was warped which made me search here. Found other potential areas from you guys and sure enough the defrost areas are warped on both sides. 2015 xlt[24]  |

[23] DNovello. "2015 Dash Warp?" [Msg 241]. FORD F150 FORUM (Oct. 9, 2015, 05:54 PM), https://www.f150forum.com/f118/2015-dash-warp-295214/index25/
[24] Antho. "2015 Dash Warp?" [Msg 282]. FORD F150 FORUM (Jan. 20, 2016, 08:07 PM), https://www.f150forum.com/f118/2015-dash-warp-295214/index29/

| 02-13-2016 | sod78 | Had my dash replaced in October. The techs did an awesome job changing it out. Couldn't tell one bit that it had been done. Well guess what's back? That's right, the dash is starting to warp in the exact same spots on drivers and passenger side. Not as bad as before, but I'm sure it will only get worse. I even bought a $50 Covercraft SunShade and have used it no matter where the truck is parked. Guess it's time to wait for a permanent fix, or |

| | | |
|---|---|---|
| | | keep getting it replaced and hope the lemon law takes care of it.[25] |
| 04-29-2016 | DEWalther2 | Put me down for it happening too. Just noticed it yesterday when I was cleaning the dash. Took it to my dealer today. They took a bunch of pictures and sent it to Ford. Just waiting to hear back. Mine was built Oct 15. Yes I am a little disappointed between this and the doors that were out of alignment. My dealer did fix that a few weeks ago and I'm very happy with the doors now. People complain about the problems with their trucks. My wife bought a new 2016 Honda Pilot and again not major but lots of little problems. So I believe this happens to manufactures with new year models. Keep me posted on what all Ford has done to you guys to get this fixed[26] <br><br>  |

[25] Sod78. "2015 Dash Warp?" [Msg 292]. FORD F150 FORUM (Feb. 13, 2016, 10:43 PM), https://www.f150forum.com/f118/2015-dash-warp-295214/index30/

[26] DEWalther2. "2015 Dash Warp?" [Msg 309]. FORD F150 FORUM (Apr. 29, 2016, 06:24 PM), https://www.f150forum.com/f118/2015-dash-warp-295214/index31/

| | | |
|---|---|---|
| | |  |
| 05-13-2016 | Carmmond | Well dash number two is warping on mine... looks just as bad as the first one![27] |
| 05-15-2016 | Fiore5oh | 2016 XLT warp starting. Owned for 2 weeks. Built 2/16. Not happy.[28] |
| 07-20-2016 | Mo_Power | Going in again...<br><br>Ford approved another dashboard for my 2015 XLT Sport.<br>This will be dashboard #3.<br><br>I'll let everyone know if this one is any better than the last two.<br><br>The service manager at Soerens Ford in Brookfield, WI is the best![29] |
| 05-09-2017 | Jamesa.3.5ECO | 2016 F150 XLT 3.5 eco black, black\grey 9k miles. Also very noticeable warp on both sides of the dash. I took it to the dealer yesterday and they took pictures. They said |

[27] Carmmond. "2015 Dash Warp?" [Msg 311]. FORD F150 FORUM (May 13, 2016, 07:08 PM, https://www.f150forum.com/f118/2015-dash-warp-295214/index32/
[28] Fiore5oh. "2015 Dash Warp?" [Msg 318]. FORD F150 FORUM (May 15, 2016, 08:08 PM), https://www.f150forum.com/f118/2015-dash-warp-295214/index32/
[29] Mo_Power. "2015 Dash Warp?" [Msg 359]. FORD F150 FORUM (Jul. 20, 2016, 10:08 PM), https://www.f150forum.com/f118/2015-dash-warp-295214/index36/

| | | |
|---|---|---|
| | | they needed approval from FORD before they could make any decisions. They also said they had never seen the problem on XLT's  somehow, I think they were lying. They brought a few managers out to see the truck and take pictures.<br><br>Extremely disappointing for a new vehicle to have problems like this. The dash material seems paper thin in those areas. When its warm you can push in those spots and press down a good 2-3 inches flex.<br><br>We'll see how they handle it.[30] |
| 08-22-2017 | Jim_Patterson | Love the 2015 XLT 5.0 Super-crew 4x4 but...<br>Just picked up this beautiful beast 10 days ago has 19k miles and about a year left on the original warranty. Went to detail my dash and noticed a pretty significant hump on both sides of the dash where the defrost vents are located.<br><br>At at first I thought it was part of the design but look from the window back into the dash and was not too happy. Plan on taking my truck to Jenkins and Wynne here in Clarksville Tennessee to see if they could correct it. Also having issues with updating sync software.<br><br>Aside from that, I am very pleased with this beautiful truck!<br><br>Jim Patterson<br>Clarksville, Tn 37040[31] |

---

[30] Jamesa.3.5ECO. "2015 Dash Warp?" [Msg 403]. FORD F150 FORUM (May 9, 2017, 10:26 AM), https://www.f150forum.com/f118/2015-dash-warp-295214/index41/

[31] Jim_Patterson. "2015 Dash Warp?" [Msg 410]. FORD F150 FORUM (Aug. 22, 2017, 08:13 PM), https://www.f150forum.com/f118/2015-dash-warp-295214/index41/

| 08-22-2017 | <-KJP-> | I went this past weekend to look at some 2017s I could not find 1 truck that had a good clean dash that was not warping/seperating around the upper vents.<br><br>Not cool ford....this has been going on for a while 2015,2016,2017[32] |

---

[32] <-KJP->. "2015 Dash Warp?" [Msg 411]. FORD F150 FORUM (Aug. 22, 2017, 08:44 PM), https://www.f150forum.com/f118/2015-dash-warp-295214/index42/

| 09-05-2017 | nix150 | Looked at a 2018!!!! Unreal.[33]<br> |
|---|---|---|
| 09-22-2017 | RCPower | Hi,<br>My 2 cents<br>As a former Dealership Master Tech (not Ford) there is no excuse to have the dash looking like that after a repair/replace. |

[33] Nix150. "2015 Dash Warp?" [Msg 412]. FORD F150 FORUM (Sep. 5, 2017, 06:27 AM), https://www.f150forum.com/f118/2015-dash-warp-295214/index42/

| | | |
|---|---|---|
| | | Now on the other side.... changing out a dash is all about time ..the tech get so much time to do this what in most cases not enough (hours short for the job and time is the techs $$$..... like if a job takes 10hr and he/she is only getting 6hr payed) so to make up time short cuts are applied and they over time will rattle.<br><br>My dash on my 2017 XLT is warping/seperating too.... less than a month old truck but will not see a shop for that till maybe 34 month from now maybe.<br><br>If the dash is replaced the odds of warping/separating again are very very high<br><br>plus some rattles!<br><br>I looked at 18 F150 17/18 models on the lot and 14 have the problem.[34] |
| 11-28-2017 | chz_head | Sigh......I have a '15 XLT that my dash warped last year but it was replaced under warranty without issue. Since then, I have passed the 36k mile factory warranty but.....low and behold, I noticed last week that the replacement is now warped as well. I went to my dealer and they took pics and submitted them to Ford to see what they had to say. To Ford's credit, they are still covering it (thankfully) based on the known issues and the fact that it's barely 12 months old.<br><br>I don't know what supplier is making these dashboards but Ford need to get this under control as these are the same dashboards in the Super Duty and the Expedition. This will only continue to get worse.<br><br>At this point, I'll be starting to take parts off my truck as I would rather not deal with a possible 3rd dash issues. I have already removed my 'Raptor' Grill and will be posting that shortly........I think a used Raptor sounds about good! |

---

[34] RCPower. "2015 Dash Warp?" [Msg 158]. FORD F150 FORUM (Sep. 11, 2015, 02:54 PM), https://www.f150forum.com/f118/2015-dash-warp-295214/index42/

| | | |
|---|---|---|
| | | Keep an eye on your dashboards, peeps!![35] |
| 04-16-2018 | wbaileyjr | My 2015 F150 XLT Sport, had the dash replaced last year (Feb 2017), the replacement warped on the passenger side within 4 months. Took truck to dealership today (April 2018) for second replacement, just under the warranty, I have it for 35 months (34,000 miles). What's even more surprising is that the 2018 F150 STX loaner (built Oct 2017) they gave me has the same warp on the passenger side. Can't believe Ford hasn't fixed this.[36] |
| 04-16-2018 | Munkeebutt | My 2018 XLT has a warped dash on the passenger side. I have not had it into the dealer yet.[37] |
| 05-02-2018 | desperado213 | Dang, I need to stop getting on this forum. I always noticed my dash was a little wavy but I thought it was just the profile of it. I looked through the windshield and sure enough my 2018 is warped a little on either side of the light sensor and a little on the passenger side airbag. Probably wont warranty it in the current condition. There is nothing I hate more than rattles....[38] |
| 09-11-2018 | maddog1949 | My 2017 XLT is starting to warp on driver and passenger side. This is my 1st Ford truck and looking like my last .[39] |
| 10-29-2018 | carlbme | Just noticed this happening on my 16 last week. Took it into the dealer today where I was told that "Ford is awre of it and tells us there is no fix. They used to pay for the |

[35] Chz_head. "2nd warped dash.....Grrrrrr! [Msg 1]. FORD F150 FORUM (Nov. 28, 2017, 10:13 PM), https://www.f150forum.com/f118/2nd-warped-dash-grrrrrr-401140/

[36] Wbaileyjr. "2015 Dash Warp?" [Msg 470]. FORD F150 FORUM (Apr.16, 2018, 10:13 PM), https://www.f150forum.com/f118/2015-dash-warp-295214/index47/

[37] Munkeebutt. "2015 Dash Warp?" [Msg 471]. FORD F150 FORUM (Apr. 16, 2018, 10:41 PM), https://www.f150forum.com/f118/2015-dash-warp-295214/index48/

[38] Desperado213. "2015 Dash Warp?" [Msg 484]. FORD F150 FORUM (May 2, 2018, 04:27 PM), https://www.f150forum.com/f118/2015-dash-warp-295214/index49/

[39] Maddog1949. "2015 Dash Warp?" [Msg 508]. FORD F150 FORUM (Sept. 11, 2018, 01:16 AM), https://www.f150forum.com/f118/2015-dash-warp-295214/index51/

| | | |
|---|---|---|
| | | dash replacement but have started to push back on this, even for some of the ones under warranty."<br><br>Said they have to take pictures and send it to Ford, sometimes Ford approves it but sometimes they don't. No clue why they wouldn't though. But we'll see. Hopefully get a new dash. Of course the fun for me is even though I've only had it just less than two years I'm almost out of warranty due to the milage. Fun times.[40] |
| 01-30-2019 | mcgraw927 | I took my 2018 XLT into the dealer, for an annoying dash rattle and it turns out the cause the dash being warped. They dealer called Ford to initiate a warranty claim and asked if there was a solution to this problem. The rep at Ford told the GM at the dealership they are supposed to have a "fix" or replacement for the warped dash components by the end of February 2019 - March 2019. The GM apologized stating there is nothing they can do until a part becomes available and I would need to wait.[41] |

## Car Complaints

| | | |
|---|---|---|
| 08-05-2015 | G M. | Pictures coming soon.<br><br>Overall I love the vehicle, but I started noticing some warping on both passenger and driver side of the dashboard. The issue is occurring in the area where the dash meets the defroster's vent. Due to how new of a model it is, I highly doubt if there's a fix out there yet. This is the first vehicle in which I've ever had this type of issue. Yes, in North Texas, our summertime temps easily exceed 100 degrees but you'd think the manufacturers make these trucks durable enough to handle the heat. |

[40] Carlbme. "2015 Dash Warp?" [Msg 529]. FORD F150 FORUM (Oct. 29, 2018, 11:30 AM),  https://www.f150forum.com/f118/2015-dash-warp-295214/index53/
[41] Mcgraw927. "2015 Dash Warp?" [Msg 534]. FORD F150 FORUM (Jan. 30, 2019, 02:07 PM), https://www.f150forum.com/f118/2015-dash-warp-295214/index54/

| | | After all, Texas is one of if not the biggest market for pickup trucks.[42] |
|---|---|---|
| 08-17-2015 | Eric P. | I live in Baltimore Maryland. I purchased a new 2015 F150 XLT from Al Packer Ford Whitemarsh in July and have only driven for a little over a month. Basically it has been in and out of the shop since August 24, 2015 at one point it was in the shop 24 days straight for a defective dashboard. Right where the front defrost vents are due the heat of defrosting and the sun the dash warps and buckles. I had a one inch gap where my two vents came apart at the seams.<br><br>I took it to the dealer they contact Ford and Ford says put a new one in. 24 days, a broken inner drivers door panel, broken ac wire harness, broken airbag later, I pickup my truck to a now extremely deformed dash and truck now more broken then before. I walked the dealers lot and all the F150s are doing the same thing as mine.<br><br>The problem is the dealerships/Ford are aware but they don't tell the customers that, oh by the way the dash in this $50000 truck is coming apart and we don't have a fix. They let them buy it hope they don't see it like I did and when they do they say ok cool your truck is going to be the test subject and we are going to keep fixing until we get something that works and then issue a recall. Oh but by the way we only pay for a rental up to $1500 after that you still have to pay your monthly payment and now for a rental!<br><br>Yeah, I bought a $50000 project for Ford and I'm financing every dollar each month. Long story short I have been a loyal Ford supporter for the past 10 years. Not anymore! John Mchale is the regional Ford rep trying to cover his you know what and dodging all my questions and phone calls because there is no fix and it has cost |

---

[42] G M. "2015 Ford F-150 Owner Comments." [Msg 1]. CARCOMPLAINTS FORUM (Aug. 5, 2015), https://www.carcomplaints.com/Ford/F-150/2015/accessories-interior/dash_warping.shtml

| | | |
|---|---|---|
| | | Ford over $5000 to make repairs to my truck which did not work. Let's see $5000 x 200,000 F150s sold or for sale that's a ton of money for Ford!<br><br>I really just want other consumers to know what they are buying before being stuck with a truck falling apart like I am.[43] |
| 09-09-2015 | f150sport | I noticed this issue around a month ago. It was one of the first cold days of September, so I decided to turn on the heater for the first time since buying it at the end of August.<br><br>After I arrived at work, I noticed that the dash looked a bit inflated or something. I pushed on it and it seems to have warped upwards.<br><br>I'll post pictures this weekend, as it appears to have gotten worse.[44]<br><br> |

---

[43] Eric P. "2015 Ford F-150 Owner Comments." [Msg 3]. CARCOMPLAINTS FORUM (Aug. 17, 2015), https://www.carcomplaints.com/Ford/F-150/2015/accessories-interior/dash_warping.shtml

[44] F150sport. "2015 Ford F-150 Owner Comments." [Msg 4]. CARCOMPLAINTS FORUM (Sep. 9, 2015), https://www.carcomplaints.com/Ford/F-150/2015/accessories-interior/dash_warping.shtml

| | | |
|---|---|---|
| | |  |
| 09-20-2015 | rpaul247 | I only had this vehicle for less than two weeks and I noticed this morning that my dash was warped. This should not happen to a brand new vehicle. I decided to look up this issue in the ford f150 forum and many owners have the same complaint on their 2015 f150. This is ridiculous especially for a new vehicle. I'm very disappointed with this. I'm calling the dealership first thing in the morning. If no satisfaction from them I'm contacting ford corporate.[45] |
| 09-21-2015 | m_white | I have the same issue as all other above. Seems like a problem with any of the XLT or below. Ford delaer has acknowledged it, but not much to do about it unless I request a new dash which will do the same according to them.<br><br>Ford needs to make a better reinforced dash for us, or upgrade it to the Lariat dash which doesn't have the issue.[46] |
| 07-28-2016 | Adam D. | The dash bubbles up by the front defrost vents. Took it in to the dealer and they didn't fix it and they said they |

[45] Rpaul247. "2015 Ford F-150 Owner Comments." [Msg 2]. CARCOMPLAINTS FORUM (Sep. 20, 2015), https://www.carcomplaints.com/Ford/F-150/2015/accessories-interior/dash_warping.shtml
[46] M_white. "2015 Ford F-150 Owner Comments." [Msg 5]. CARCOMPLAINTS FORUM (Sep. 21, 2015), https://www.carcomplaints.com/Ford/F-150/2015/accessories-interior/dash_warping.shtml

| | | |
|---|---|---|
| | | couldn't do anything about it. Very frustrating. Ford ignores their customers.[47] |
| 05-06-2018 | Abstrakt C. | Took to dealer twice before they admitted it's a know problem and no current fix. First time I was told that's the way they all are, so I elevated it to Ford customer service to open a case. Still no fix, but at least they acknowledge the issue.[48] |

## TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL

118.   Any applicable statutes of limitation have been tolled by Ford's knowing and active concealment of the Defect as well as the omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and members of the Class were deceived regarding the Defect and could not reasonably discover the defect or Ford's deception with respect to the Defect.

119.   At all times, Ford was and is under a continuous duty to disclose to Plaintiffs and members of the Class the true standard, quality, character, nature and grade of the Class Vehicles and to disclose the Defect. Instead, Ford omitted disclosure of the presence of the Defect and continues to sell Class Vehicles that contain the Defect, rather than repairing them prior to sale. Ford actively concealed the true standard, quality, character, nature and grade of the Class Vehicles and

---

[47] Adam D. "2015 Ford F-150 Owner Comments." [Msg 6]. CARCOMPLAINTS FORUM (Jul. 28, 2016), https://www.carcomplaints.com/Ford/F-150/2015/accessories-interior/dash_warping.shtml

[48] Abstrakt C. "2015 Ford F-150 Owner Comments." [Msg 7]. CARCOMPLAINTS FORUM (May 6, 2018), https://www.carcomplaints.com/Ford/F-150/2015/accessories-interior/dash_warping.shtml

omitted material information about the quality, reliability, characteristics and performance of the Class Vehicles. Plaintiffs and members of the Class reasonably relied on Ford's knowledge and concealment of the facts alleged herein.

120.   For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Ford's fraudulent concealment; further, Defendant is estopped from relying on any statutes of limitations in defense of this action.

## CLASS ALLEGATIONS

121.   Plaintiffs bring this action pursuant to the provisions of Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the following proposed classes:

> **Nationwide Class:**
> All persons or entities who purchased or leased a Class Vehicle in the United States and resided in the United States at the time of purchase (the "Nationwide Class").
>
> **Florida Subclass**
> All persons or entities who purchased or leased a Class Vehicle in Florida and resided in Florida at the time of purchase (the "Florida Class").
>
> **California Subclass:**
> All persons or entities who purchased or leased a Class Vehicle in California and resided in California at the time of purchase (the "California Class").
>
> **Illinois Subclass:**
> All persons or entities who purchased or leased a Class Vehicle in Illinois and resided in Illinois at the time of purchase (the "Illinois Class").

> **Virginia Subclass:**
> All persons or entities who purchased or leased a Class Vehicle in Virginia and resided in Virginia at the time of purchase (the "Virginia Class").

122. Excluded from the Class are Ford, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors, wholly- or partly-owned, and its subsidiaries and affiliates; Ford dealers; proposed Class counsel and their employees; the judicial officers and associated court staff assigned to this case and their immediate family members; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and his/her immediate family.

123. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

124. This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

125. <u>Numerosity</u>. Federal Rule of Civil Procedure 23(a)(1): The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. Hundreds of thousands of Class Vehicles have been sold in the United States. Class members may be notified of the pendency of this

action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

126.  <u>Commonality and Predominance</u>. Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a.  Whether Ford engaged in the conduct alleged herein;

b.  Whether Ford designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

c.  Whether the Original Dash in the Class Vehicles is defective, and, if so, the nature of that defect;

d.  Whether Ford knew about the Defect in the Original Dash and, if so, how long Ford has known of it;

e.  Whether Ford designed, manufactured, marketed, and distributed the Class Vehicles with the Defect in the Original Dash;

f.  Whether the New Dash is defective and, if so, the nature of that defect;

g.  Whether Ford knew about the Defect in the New Dash and, if so, how long Ford has known of it;

h.  Whether Ford's conduct violates consumer protection statutes, false advertising laws, sales contracts, warranty laws, and other laws as asserted herein;

i.  Whether Plaintiffs and the other Class members overpaid for their Class Vehicles;

j.  Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

    k.  Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

127.  <u>Typicality</u>. Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Ford's wrongful conduct as described above.

128.  <u>Adequacy</u>. Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

129.  <u>Declaratory and Injunctive Relief</u>. Federal Rule of Civil Procedure 23(b)(2): Ford has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief with respect to the Class as a whole.

130.  <u>Superiority</u>. Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the

burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for the members of the Class to individually seek redress for Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIOLATIONS ALLEGED

### COUNT I
### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *ET SEQ.*)
### (On behalf of the Nationwide Class and Each State Subclass)

131.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

132.   Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

133.   Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

134.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

135.   15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

136.   Ford's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Class Vehicle's implied warranties are covered under 15 U.S.C. § 2301(7).

137.   Ford breached these warranties, as described in more detail above. Without limitation, the Class Vehicles possess a latent defect that Ford has knowlingly failed to remedy in direct contravention of its written warranty. The Original Dash in the Class Vehicles was defectively manufactured. The Class Vehicles share a common manufacturing defect which can, among other things, cause the Original and New Dash to warp, buckle, rattle or otherwise deform.

138.   Plaintiffs and the other Nationwide Class members have had sufficient direct dealings with either Ford or its agents (*e.g.*, dealerships and technical support) to establish privity of contract between Ford on one hand, and Plaintiffs and each of the other Nationwide Class members on the other hand.

139.   Nonetheless, privity is not required here because Plaintiffs and each of the other Nationwide Class members are intended third-party beneficiaries of contracts between Ford and its dealers, and specifically, of Ford's warranties and implied warranties. Indeed, Ford's own warranty on each Class Vehicle requires

Class Members not to submit their vehicle to Ford for repairs, but to the dealers, even though the warranty flows from Ford to the Class Members. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

140.   Ford has furthermore failed to honor its warranty by failing to properly repair or otherwise remedy the Defect in the Class Vehicles. As detailed above Plaintiffs have given Ford and their agents ample opportunity to repair the vehicles by contacting Ford's national customer service line, and by presenting their vehicles to Ford's authorized dealers as described in Ford's operative warranty. Ford has either provided a New Dash which has the same Defect, or failed entirely to provide repairs or replacements. In either case, Ford has failed to cure the Defect as Ford's warranty promises to do.

141.   At the time of sale or lease of each Class Vehicle, Ford knew, should have known, or was reckless in not knowing of its omissions concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the Defect in the Original and New Dash. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure has been satisfied.

142. Plaintiffs and the other Nationwide Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because Ford is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiff and the other Nationwide Class members have not re-accepted their Class Vehicles by retaining them.

143. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $5,000,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

144. Plaintiff, individually and on behalf of the other Nationwide Class members, seeks all damages permitted by law, including diminution in value of the Class Vehicles, in an amount to be proven at trial.

## COUNT II
## VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR
## TRADE PRACTICES ACT
## (FLA. STAT. § 501.201, ET SEQ.)
## (On Behalf of the Florida Subclass)

145. Plaintiffs Carter, Glass, Siracuse, and Linderman ("Plaintiffs," for purposes of all Florida Subclass Counts) incorporate by reference all preceding allegations as though fully set forth herein.

146. Plaintiffs bring this claim on behalf of the Florida Subclass.

147.   Plaintiffs and Class members are "consumers" within the meaning of Fla. Stat. § 501.203(7).

148.   Defendant is engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

149.   Defendant omitted disclosure of the known and material fact that the Original and New Dash possess the Defect. This conduct constitutes unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices within the meaning of Fla. Stat. § 501.204, *et seq*.

150.   Reasonable consumers, like Plaintiffs, would be deceived by Defendant's conduct in promoting the Class Vehicles without disclosing information concerning the Defect in the Original and New Dash.

151.   As described above, Plaintiffs and the Class suffered damages because the Class Vehicles possess the Defect in the Original and New Dash. The Defect caused Plaintiffs and other Florida Subclass members to sustain damages in the form of loss of use of their vehicles and/or costs of replacement of the Original Dash.

152.   As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and the Florida Class Members have suffered harm in that they bought Class Vehicles they otherwise would not have, overpaid for their Class Vehicles, did not receive the benefit of their bargain, and/or their Class Vehicles suffered a diminution in value.

153.   The Class Vehicles with the Original and New Dash do not function as advertised and warranted by Defendant. This condition has caused Plaintiffs' damages, which can be measured with specificity based upon, *inter alia*, the overpayment at the time of purchase, as well as, cost of parts and labor to secure and complete installation of a suitable replacement dash.

154.   As a result of Defendant's omissions, Plaintiffs suffered actual damages within the meaning of Fla. Stat. § 501.211, because the Plaintiffs were or will be forced to pay for parts and labor for replacement of the Original or New Dash with non-defective alternatives. Additionally, Plaintiff and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

## COUNT III
## BREACH OF EXPRESS WARRANTY
## (FLA. STAT. § 672.313)
## (On behalf of the Florida Subclass)

155.   Plaintiffs Carter, Glass, Siracuse, and Linderman ("Plaintiffs," for purposes of all Florida Subclass Counts) incorporate by reference all preceding allegations as though fully set forth herein.

156.   Defendant is and was at all relevant times a merchant with respect to motor vehicle sales.

157.   In connection with the purchase of the Class Vehicles, Defendant provided Plaintiffs with a written warranty covering defects in materials and workmanship of the Class Vehicles, as detailed above. In addition, Defendant's

various oral and written representations regarding the Class Vehicles' durability, reliability, safety, and performance constituted express warranties to the Florida Subclass.

158.   Ford breached these warranties, as described in more detail above. Without limitation, the Class Vehicles possess a latent defect that Ford has knowlingly failed to remedy in direct contravention of its written warranty. The Original Dash in the Class Vehicles was defectively manufactured. The Class Vehicles share a common manufacturing defect which can, among other things, cause the Original and New Dash to warp, buckle, rattle or otherwise deform.

159.   Plaintiffs and the other Florida Class members have had sufficient direct dealings with either Ford or its agents (*e.g.*, dealerships and technical support) to establish privity of contract between Ford on one hand, and Plaintiffs and each of the other Florida Class members on the other hand.

160.   Nonetheless, privity is not required here because Plaintiffs and each of the other Florida Class members are intended third-party beneficiaries of contracts between Ford and its dealers, and specifically, of Ford's warranties and implied warranties. Indeed, Ford's own warranty on each Class Vehicle requires Class Members not to submit their vehicle to Ford for repairs, but to the dealers, even though the warranty flows from Ford to the Class Members. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under

the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

161.   Defendant's warranties formed a basis of the bargain that was reached when Plaintiffs and the Florida Subclass members purchased or leased their Class Vehicles.

162.   Defendant breached its express warranties (including the implied covenant of good faith and fair dealing) by: (a) knowingly providing Plaintiffs and the Florida Subclass with Class Vehicles containing defects in material that were never disclosed to Plaintiffs and the Florida Subclass; (b) failing to repair or replace the Defect in the Class Vehicles at no cost within the warranty period, either due to replacement with a New Dash which also included the Defect, or due to failure to provide any repair at all; (c) ignoring, delaying responses to, and denying warranty claims in bad faith; and / or (d) supplying products and materials that failed to conform to the representations made by Defendant.

163.   Plaintiffs and the Florida Subclass have given Defendant a reasonable opportunity to cure its breaches of express warranty or, alternatively, were not required to do so because such an opportunity would be unnecessary and futile because of Defendant's consistent failure to acknowledge or cure the Defect.

164.   Thus, Defendant's written warranty fails of its essential purpose and the recovery of Plaintiffs and the Florida Subclass is not limited to its remedies.

165.   Accordingly, Plaintiffs and the Florida Subclass assert as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the Florida Subclass members of the purchase price of all Class Vehicles currently owned, and for such other incidental and consequential damages as allowed.

166.   As a direct and proximate result of Defendant's breach of its express warranty, Plaintiffs and the Florida Subclass members have been damaged in an amount to be determined at trial.

167.   Defendant was provided notice of the issues raised in this Count and this Complaint as detailed above.

## COUNT IV
## BREACH OF IMPLIED WARRANTY
## (FLA STAT. §§ 672.314-315)
## (On Behalf of the Florida Subclass)

168.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

169.   Plaintiffs bring this Count on behalf of the Florida Subclass.

170.   Ford designed, developed, manufactured, distributed, and marketed Class Vehicles for purposes of sale to retail buyers.

171.   Defendant impliedly warranted that the Class Vehicles, and the Original Dashboards within them, were properly designed, developed, tested,

manufactured, distributed, marketed, and sold, and that the designs and materials were of workmanlike quality.

172.   Additionally, Fla. Stat. § 672.314-315 (Uniform Commercial Code) implies warranties of merchantability and fitness for a particular purpose.

173.   The Class Vehicles, owing to the Defect in the Original Dashboards, are not merchantable because they have a propensity to warp and buckle. This condition renders dashboards in the Class Vehicles unfit for their ordinary purpose, and making the Class Vehicles objectionable in the trade.

174.   Ford knew that Plaintiffs and the Class members would use the Class Vehicles, and thereby the Original Dashboards, as they were intended to be used, in a variety of environments throughout the United States and Ford should have used its own skill and judgment in the industry to furnish suitable materials for use in normal vehicular applications, as Ford did in the higher trim level F-150s.  The Class Vehicles, and more precisely, the Original Dashboards, are not fit for their intended purpose because they do not function properly, often exhibiting the Defect while still on the lot prior to being sold.

175.   Ford breached said warranties by failing to provide adequate and proper designs, calculations, or materials for the production of the Original Dashboards installed in the Class Vehicles, as well as the New Dashboards.

176.   The Class Vehicles in general, and the Original Dashboards, in particular fail to perform in accordance with the reasonable expectations of consumers such as Plaintiffs and Class members to have properly functioning dashboards that do not warp or deform.

177.   Ford had, and has, a duty and responsibility to disclose to the consuming public the Defect in the Class Vehicles; Ford further had, and has, a duty not to put defective products on the market.

178.   But for Ford's breach of implied warranty, Plaintiffs and the Class would not have sustained damages in the form of costly repairs and decreased value of their Class Vehicles.

179.   As a direct and proximate result of the breach of said warranties, Plaintiffs and the Florida Subclass have suffered and will continue to suffer damages for having to pay to replace the Defect in the Original Dashboards, as alleged herein, in an amount to be determined at trial.

180.   Plaintiffs, on behalf of themselves and all others similarly situated, demand judgment against Ford for compensatory damages, for the establishment of a common fund, plus attorneys' fees, interest and costs.

## COUNT V
## VIOLATION OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT
### (CAL. CIV. CODE § 1750, ET SEQ.)
### (On behalf of the California Subclass)

181.   Plaintiff Mendoza ("Plaintiff," for purposes of all California Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

182.   Plaintiff brings this Count on behalf of the California Subclass.

183.   California's Consumers Legal Remedies Act ("CLRA"), CAL. CIV. CODE § 1750, *et seq*., proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

184.   The Class Vehicles are "goods" as defined in CAL. CIV. CODE §§ 1751(a).

185.   Plaintiff and the other Class members are "consumers" as defined in CAL. CIV. CODE § 1761(d), and Plaintiff, the other Class members, and Ford are "persons" as defined in CAL. CIV. CODE § 1761(c).

186.   As alleged above, in purchasing or leasing the Class Vehicles, Plaintiff and the other Class members were deceived by Ford's failure to disclose that the Class Vehicles suffered from the Defect.

187.   Ford's conduct, as described herein, was and is in violation of the CLRA. Ford's conduct violates at least the following enumerated CLRA provisions:

   a. CAL. CIV. CODE § 1770(a)(2): Misrepresenting the approval or certification of goods;

  b. CAL. CIV. CODE § 1770(a)(5): Representing that goods have sponsorship, approval, characteristics, uses, benefits, or quantities which they do not have;

  c. CAL. CIV. CODE § 1770(a)(7): Representing that goods are of a particular standard, quality, or grade, if they are of another;

  d. CAL. CIV. CODE § 1770(a)(9): Advertising goods with intent not to sell them as advertised; and

  e. CAL. CIV. CODE § 1770(a)(14): Representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law.

  f. CAL. CIV. CODE § 1770(a)(16): Representing that goods have been supplied in accordance with a previous representation when they have not.

  g. CAL. CIV. CODE § 1770(a)(17): Inserting an unconscionable provision in the contract.

188. Plaintiff and the other Class members have suffered injury in fact and actual damages resulting from Ford's material omissions because they paid an inflated purchase or lease price for the Class Vehicles.

189. Ford knew, should have known, or was reckless in not knowing of the defective manufacture of the Original and New Dash.

190. The facts concealed and omitted by Ford to Plaintiff and the other Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles, or to pay a lower price. Had Plaintiff and the other Class members known about the defective

nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would not have paid the prices they ultimately paid.

191.   Plaintiff Mendoza on behalf of himself and all prospective Class Vehicle owners provided Ford with notice of its alleged violations of the CLRA pursuant to California Civil Code § 1782(a). If Defendant fails to provide appropriate relief for its violations of the CLRA, Plaintiff intends to amend this Complaint to seek monetary, compensatory, and punitive damages from Ford in addition to the injunctive and equitable relief that is currently sought.

192.   In accordance with Civil Code § 1780 (a), Plaintiff and the other Class members seek injunctive relief for Ford's violations of the CLRA, including an injunction to enjoin Ford from continuing its unfair and/or deceptive advertising, acts, and/or business practices in connection with the lease and/or sale of the Class Vehicles.

193.   Pursuant to Cal. Civ. Code § 1782(a)(2), Plaintiff demands judgment against Defendants under the CLRA for injunctive relief.

194.   Plaintiff, individually and as a member of the Class, has no adequate remedy at law for the future unlawful acts, methods, or practices as set forth above.

195.   Pursuant to § 1780(d) of the CLRA, Plaintiff contemperaneously provides an affidavit showing that this action has been commenced in the proper forum.

196.   Plaintiff and the other Class members' injuries were proximately caused by Ford's fraudulent and deceptive business practices.

197.   Defendant's practices, acts and courses of conduct in connection with the sale of its products, as described above, are likely to mislead a reasonable consumer acting reasonably under the circumstances to his or her detriment. As a result of Defendant's acts and practices as alleged in this Complaint, Plaintiff and the Class are entitled relief as set forth above.

198.   Plaintiff and the Class reasonably believed and/or depended on the material false and/or misleading information provided by, or omitted by, Defendant with respect to Defendant's unfair and/or deceptive acts and/or practices.

<u>**COUNT VI**</u>
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**
**(CAL. BUS. & PROF. CODE § 17200, ET SEQ.)**
**(On behalf of the California Subclass)**

199.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

200.   Plaintiff brings this Count on behalf of the California Subclass.

201.   California's Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE § 17200, *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

202.    Ford's conduct, as described herein, was and is in violation of the UCL.

Ford's conduct violates the UCL in at least the following ways:

a.    By knowingly and intentionally concealing from Plaintiff and the other Class members that the Class Vehicles suffer from the Defect while obtaining money from Plaintiff and the Class;

b.    By marketing the Class Vehicles as being functional and defect-free;

c.    By refusing or otherwise failing to adequately repair and/or cure the Defect in the Class Vehicles;

d.    By engaging in business practices in a manner which is contrary to public policy, is immoral, unethical, oppressive, and/or unscrupulous and causes injury to consumers which outweighs its benefits;

e.    By violating federal laws in: failing to effectively recall and repair vehicles that contain a defect; Section 5 of the FTC Act, which prohibits "unfair or deceptive acts or practices in or affecting commerce; and Violation of the Magnuson-Moss Warranty Act;

f.    By violating common law, including breach of express warranty; breach of implied warranty of merchantability; unjust enrichment; and/or

g.    By violating other California laws, including Breach of the Implied Warranty of Merchantability; Violations of the Song-Beverly Consumer Warranty Act; California laws governing false advertising and consumer protection, including but not limited to California's False Advertising Law; and California's Consumer Legal Remedies Act.

203.    Ford's omissions alleged herein caused Plaintiff and the other Class members to make their purchases or leases of their Class Vehicles. Absent those omissions, Plaintiff and the other Class members would not have purchased or leased

these vehicles, would not have purchased or leased these Class Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that instead operated safely and did not contain the Defect.

204.   Accordingly, Plaintiff and the other Class members have suffered injury in fact, including lost money or property, as a result of Ford's omissions.

205.   Plaintiff seeks to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Ford under CAL. BUS. & PROF. CODE § 17200.

206.   Plaintiff requests that this Court enter such orders or judgments as may be necessary to enjoin Ford from continuing its unfair, unlawful, and/or deceptive practices; to restore to Plaintiff and members of the Class any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in CAL. BUS. & PROF. CODE §§ 17203 & 3345; and for such other relief set forth below.

## COUNT VII
### VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW
### (CAL. BUS. & PROF. CODE § 17500, ET SEQ.)
### (On behalf of the California Subclass)

207.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

208.   Plaintiff brings this Count on behalf of the California Subclass.

209.   CAL. BUS. & PROF. CODE § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal

81

property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

210.   Ford caused to be made or disseminated through California and the United States, through advertising, marketing, other publications, the Monroney label present on each Class Vehicle at time of sale, statements that were untrue, misleading, or omitted material facts, and which were known, or which by the exercise of reasonable care should have been known to Ford, to be untrue and misleading to consumers, including Plaintiff and the other Class members.

211.   Ford has violated CAL. BUS. & PROF. CODE § 17500 because of omissions regarding the characteristics of the Class Vehicles, as set forth in this Complaint, were material and likely to deceive a reasonable consumer.

212.   Plaintiff and the other Class members have suffered an injury in fact, including the loss of money or property, as a result of Ford's unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Class Vehicles, Plaintiff and the other Class members relied on the omissions of Ford with respect to the characteristics of the Class Vehicles.

213.   Ford's representations turned out not to be true because the Class Vehicles are distributed with the Defect in the Original Dash. Had Plaintiff and the other Class members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them as they did. Accordingly, Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

214.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Ford's business. Ford's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of California and nationwide.

215.   Plaintiff, individually and on behalf of the other Class members, requests that this Court enter such orders or judgments as may be necessary to enjoin Ford from continuing their unfair, unlawful, and/or deceptive practices, to restore to Plaintiff and the other Class members any money Ford acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## COUNT VIII
## VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF EXPRESS WARRANTIES
## (CAL. CIV. CODE §§ 1791.2 & 1793.2(D))
### (On behalf of the California Subclass)

216.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

217.   Plaintiffs bring this Count on behalf of the California Class.

218.   Plaintiffs and the other Class members who purchased or leased the Class Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

219.   The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code  § 1791(a).

220.   Ford is a "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

221.   Plaintiffs and the other Class members bought/leased new motor vehicles manufactured by Ford.

222.   Ford made express warranties to Plaintiffs and the other Class members within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, as described above.

223.   Plaintiff and other Class members have requested repairs of the Defect pursuant to the express warranty, but have failed to receive such repairs. For example, Plaintiff Mendoza made a request for a warranty repair following the

84

Defendant's release of TSB 19-2041. Yet Plaintiff Mendoza's requests – made both to Defendant's agent, his local authorized Ford dealer, and directly to Defendant via its national customer service line—were denied despite multiple requests.

224.   Pursuant to Cal. Civ. Code §§ 1793.2 & 1794, Plaintiffs and the other Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

225.   Pursuant to Cal. Civ. Code § 1794, Plaintiffs and the other Class members are entitled to costs and attorneys' fees.

## COUNT IX
### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### (815 ILCS 505/1, ET SEQ. AND 510/2)
### (On Behalf of the Illinois Subclass)

226.   Plaintiff Deakin ("Plaintiff," for purposes of all Illinois Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

227.   Plaintiff brings this claim on behalf of the Illinois Subclass.

228.   Ford, Plaintiff, and the Illinois Subclass members are "persons" within the meaning of 815 ILCS 505/1(c) and 510/1(5).

229.   Plaintiff and the Illinois Subclass members are "consumers" within the meaning of 815 ILCS 505/1(e).

230.   The Illinois Consumer Fraud and Deceptive Practices Act ("Illinois CFA") makes unlawful "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby."  815 ILCS 505/2.

231.   The Illinois CFA further makes unlawful deceptive trade practices undertaken in the course of business.  815 ILCS 510/2.

232.   In the course of its business, Ford violated the Illinois CFA by knowingly misrepresenting and intentionally concealing material facts regarding the durability, reliability, safety, and performance of the Class Vehicles, as detailed above. Specifically, in marketing, offering for sale, and selling the defective Ford Vehicles, Ford engaged in one or more of the following unfair or deceptive acts or practices prohibited by 815 ILCS 505/2 and 510/2:

> a.  Representing that the Ford Vehicles have characteristics or benefits that they do not have;
>
> b.  Representing that the Ford Vehicles are of a particular standard and quality when they are not;
>
> c.  Advertising the Ford Vehicles with the intent not to sell them as advertised;

   d.  Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

   e.  Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale of the Ford Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

233.   Ford's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the Illinois Subclass, and Ford misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the Illinois State Class would rely on the misrepresentations, concealments, and omissions.  Had they known the truth, Plaintiff and the Illinois Subclass would not have purchased the Class Vehicles, or would have paid significantly less for them.

234.   Plaintiff and the Illinois Subclass members had no way of discerning that Ford's representations were false and misleading, or otherwise learning the facts that Ford had concealed or failed to disclose.

**COUNT X**
**BREACH OF EXPRESS WARRANTY**
**(810 ILL. COMP. STAT. § 5/2-313)**
**(On Behalf of the Illinois Subclass)**

235.   Plaintiff Deakin ("Plaintiff," for purposes of all Illinois Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

236.   Defendant is and was at all relevant times a merchant with respect to motor vehicle sales.

237.   In connection with the purchase of the Class Vehicles, Defendant provided Plaintiff with a written warranty covering defects in materials and workmanship of the Class Vehicles, as detailed above. In addition, Defendant's various oral and written representations, including the Monroney labels present on each Class Vehicle regarding the Class Vehicles' durability, reliability, safety, and performance constituted express warranties to the Illinois Subclass.

238.   Defendant's warranties formed a basis of the bargain that was reached when Plaintiff and the Illinois Subclass members purchased or leased their Class Vehicles.

239.   Defendant breached its express warranties (including the implied covenant of good faith and fair dealing) by: (a) knowingly providing Plaintiff and the Illinois Subclass with Class Vehicles containing defects in material that were never disclosed to Plaintiff and the Illinois Subclass; (b) failing to repair or replace the Defect in the Class Vehicles at no cost within the warranty period, either due to replacement with a New Dash which also included the Defect, or due to failure to provide any repair at all; (c) ignoring, delaying responses to, and denying warranty claims in bad faith; and / or (d) supplying products and materials that failed to conform to the representations made by Defendant.

240.   Plaintiff and the Illinois Subclass have given Defendant a reasonable opportunity to cure its breaches of express warranty or, alternatively, were not required to do so because such an opportunity would be unnecessary and futile because of Defendant's consistent failure to acknowledge or cure the Defect.

241.   Thus, Defendant's written warranty fails of its essential purpose and the recovery of Plaintiff and the Illinois Subclass is not limited to its remedies.

242.   Accordingly, Plaintiff and the Illinois Subclass assert as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and the Illinois Subclass members of the purchase price of all Class Vehicles currently owned, and for such other incidental and consequential damages as allowed.

243.   As a direct and proximate result of Defendant's breach of its express warranty, Plaintiff and the Illinois Subclass members have been damaged in an amount to be determined at trial.

244.   Defendant was provided notice of the issues raised in this Count and this Complaint as detailed above.

## COUNT XI
### BREACH OF IMPLIED WARRANTY
### (810 ILL. COMP. STAT. §§ 5/2-314 AND 5/2-315)
### (On Behalf of the Illinois Subclass)

245.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

246.   Plaintiff brings this Count on behalf of the Illinois Subclass.

247.   Ford is and was at all times relevant to this Complaint a "merchant" with respect to the Class Vehicles under 810 ILL. COMP. STAT. § 5/2-104(1).

248.   Ford is and was at all times relevant to this Complaint a "seller" of the Class Vehicles under § 5/2-103(1)(d).

249.   The Class Vehicles are and were at all times relevant to this Complaint "goods" within the meaning of 810 ILL. COMP. STAT. § 5/2-105(1).

250.   A warranty that the Class Vehicles were in merchantable condition and fit for their ordinary purpose is implied by law pursuant to 810 ILL. COMP. STAT. § 5/2-314.

251.   In addition, a warranty that the Class Vehicles were fit for their particular purpose is implied by law pursuant to 810 ILL. COMP. STAT. § 5/2-315. Ford knew at the time of sale of the Class Vehicles that Plaintiffs and the Illinois State Class intended to use the vehicles in a manner requiring a particular standard of performance and durability, and that Plaintiffs and the Illinois State Class were relying on Ford's skill and judgment to furnish suitable products for this particular purpose, including the materials used to produce and install the dashboards in the Class Vehicles.

252.   The Original and New Dashboards within the Class Vehicles, when sold and at all times thereafter, were not in merchantable condition, not fit for their

ordinary purpose, and were not fit for their particular purpose as a result of their inherent defects, as detailed above. In addition, because any warranty repairs or replacements offered by Ford cannot cure the defect in the Class Vehicles, they fail to cure Ford's breach of implied warranties.

253.   As a direct and proximate result of Ford's breach of its implied warranties, Plaintiff and the Illinois State Class members have been damaged in an amount to be determined at trial.

254.   Ford was provided notice of the issues raised in this Count and this Complaint as detailed above.

## COUNT XII
## VIOLATION OF VIRGINIA CONSUMER PROTECTION ACT
### (VA. CODE ANN. § 59.1-196, ET SEQ.)
### (On Behalf of the Virginia Subclass)

255.   Plaintiff Zelaska ("Plaintiff," for purposes of all Virginia Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

256.   Plaintiff brings this claim on behalf of the Virginia Subclass.

257.   Ford and the Virginia Subclass members are "persons" within the meaning of VA. CODE ANN. § 59.1-198.

258.   Ford is and was at all times relevant to this Complaint a "supplier" under VA. CODE ANN. § 59.1-198.

259.   The sale of the Class Vehicles is and was at all times relevant to this Complaint a "consumer transaction" within the meaning of VA. CODE ANN. § 59.1-198.

260.   The Virginia Consumer Protection Act ("Virginia CPA") prohibits certain "fraudulent acts or practices committed by a supplier in connection with a consumer transaction…" and lists prohibited practices which include:

> (5) Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits;
>
> (6) Misrepresenting that goods or services are of a particular standard, quality, grade, style or model;
>
> (8) Advertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised;
>
> (14) Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

VA. CODE ANN. § 59.1-198.

261.   In the course of its business, Ford violated the Virginia CPA by knowingly misrepresenting and intentionally concealing material facts regarding the durability, reliability, safety, and performance of the Original and New Dashboards in the Class Vehicles, as detailed above. Specifically, in marketing, offering for sale, and selling the defective Class Vehicles, Ford engaged in one or more of the following unfair or deceptive acts or practices within the meaning of VA. CODE ANN. § 59.1-198 et seq. by:

a. Representing that the Class Vehicles have characteristics or benefits that they do not have;

b. Representing that the Class Vehicles are of a particular standard and quality when they are not; and/or;

c. Advertising the Class Vehicles with the intent not to sell them as advertised.

262.   Ford's scheme and concealment of the true characteristics of the Class Vehicles were material to the Virginia Subclass, and Ford misrepresented, concealed, or failed to disclose the truth with the intention that the Virginia Subclass would rely on the misrepresentations, concealments, and omissions. Had they known the truth, the Virginia Subclass would not have purchased the Class Vehicles, or would have paid significantly less for them.

263.   The Virginia Subclass members had no way of discerning that Ford's representations were false and misleading, or otherwise learning the facts that Ford had concealed or failed to disclose.

264.   Ford had an ongoing duty to the Virginia Subclass to refrain from unfair and deceptive practices under the Virginia CPA in the course of its business. Specifically, Ford owed the Virginia Subclass members a duty to disclose all the material facts concerning the Class Vehicles because it possessed superior and exclusive knowledge, it intentionally concealed such material facts from the Virginia Subclass, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

265.   The Virginia Subclass members suffered ascertainable loss and actual damages as a direct and proximate result of Ford's concealment, misrepresentations, and/or failure to disclose material information.

266.   Pursuant to VA. CODE ANN. § 59.1-204, the Virginia Subclass seeks an order awarding damages, treble damages, and any other just and proper relief available under the Virginia CPA.

**COUNT XIII**
**BREACH OF EXPRESS WARRANTY**
**(VA. CODE ANN. §§ 8.2-313)**
**(On Behalf of the Virginia Subclass)**

267.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

268.   Plaintiff brings this Count on behalf of the Virginia Subclass.

269.   Defendant is and was at all relevant times a merchant with respect to motor vehicle sales.

270.   In connection with the purchase of the Class Vehicles, Defendant provided Plaintiff with a written warranty covering defects in materials and workmanship of the Class Vehicles, as detailed above. In addition, Defendant's various oral and written representations regarding the Class Vehicles' durability, reliability, safety, and performance constituted express warranties to the Virginia Subclass.

271.   Defendant's warranties formed a basis of the bargain that was reached when Plaintiff and the Virginia Subclass members purchased or leased their Class Vehicles.

272.   Defendant breached its express warranties (including the implied covenant of good faith and fair dealing) by: (a) knowingly providing Plaintiff and the Virginia Subclass with Class Vehicles containing defects in material that were never disclosed to Plaintiff and the Virginia Subclass; (b) failing to repair or replace the Defect in the Class Vehicles at no cost within the warranty period, either due to replacement with a New Dash which also included the Defect, or due to failure to provide any repair at all; (c) ignoring, delaying responses to, and denying warranty claims in bad faith; and / or (d) supplying products and materials that failed to conform to the representations made by Defendant.

273.   Plaintiff and the Virginia Subclass have given Defendant a reasonable opportunity to cure its breaches of express warranty or, alternatively, were not required to do so because such an opportunity would be unnecessary and futile because of Defendant's consistent failure to acknowledge or cure the Defect.

274.    Thus, Defendant's written warranty fails of its essential purpose and the recovery of Plaintiff and the Virginia Subclass is not limited to its remedies.

275.   Finally, due to Ford's breach of warranties as set forth herein, Plaintiffs and the other Class members assert as an additional and/or alternative remedy, as set

forth in VA. CODE ANN. § 8.2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the other Class members of the purchase price of all Class Vehicles currently owned for such other incidental and consequential damages as allowed under VA. CODE ANN. §§ 8.2-711 and 8.2-608. As a direct and proximate result of Defendant's breach of its express warranty, Plaintiff and the Virginia Subclass members have been damaged in an amount to be determined at trial.

276.   Defendant was provided notice of the issues raised in this Count and this Complaint as detailed above.

## COUNT XIV
## BREACH OF IMPLIED WARRANTY
## (VA. CODE ANN. §§ 8.2-314 AND 8.2-315)
### (On Behalf of the Virginia Subclass)

277.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

278.   Plaintiff brings this Count on behalf of the Virginia Subclass.

279.   Ford is and was at all times relevant to this Complaint a "seller" with respect to the Class Vehicles under VA. CODE ANN. § 8-2-313 (1) and (2).

280.   At all times relevant to this Complaint, Ford also was and is a "merchant" within the meaning of VA. CODE ANN. § 8-2- 104(1). 1643.

281.   The Virginia Subclass are and were at all times relevant to this Complaint "buyers" with respect to the Class Vehicles under VA. CODE ANN. § 8-2-313 (1).

282.   The Class Vehicles are and were at all times relevant to this Complaint "goods" within the meaning VA. CODE ANN. § 8-2-313 (1) and (2).

283.   A warranty that the Class Vehicles were in merchantable condition and fit for their ordinary purpose is implied by law pursuant to VA. CODE ANN. § 8.2-314.

284.   In addition, a warranty that the Class Vehicles were fit for their particular purpose is implied by law pursuant to VA. CODE ANN. § 8.2-315.

285.   Ford knew at the time of sale of the Class Vehicles that the Virginia Subclass intended to use the vehicles in a manner requiring a particular standard of performance and durability, and that the Virginia State Class was relying on Ford's skill and judgment to furnish suitable products for this particular purpose.

286.   The Class Vehicles, when sold and at all times thereafter, were not in merchantable condition, not fit for their ordinary purpose, and were not fit for their particular purpose as a result of their inherent defects, as detailed above. In addition, because any warranty repairs or replacements offered by Ford—including the New Dashboard—cannot cure the defect in the Class Vehicles, they fail to cure Ford's breach of implied warranties.

287.  As a direct and proximate result of Ford's breach of its implied warranties, the Virginia Subclass members have been damaged in an amount to be determined at trial.

288.  Ford was provided notice of the issues raised in this Count and this Complaint as detailed above.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class and Subclasses, respectfully request that the Court enter judgment against Defendant and in favor of Plaintiffs, the Class, and Subclasses, and award the following relief:

A.      Certification of this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as the representatives of the Class and Subclass, and Plaintiffs' counsel as counsel for the Class and Subclass;

B.      An order awarding declaratory relief and temporarily and permanently enjoining Ford from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.      Appropriate injunctive relief;

D.      A declaration that Ford is financially responsible for all Class notice and the administration of Class relief;

E.      An order awarding any applicable statutory and civil penalties;

F.      An order requiring Ford to pay both pre- and post-judgment interest on any amounts awarded;

G.      An award of costs, expenses, and attorneys' fees as permitted by law; and

H.      Such other or further relief as the Court may deem appropriate, just, and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

Dated: October 23, 2019                    Respectfully submitted,

*/s/ Jon Herskowitz*
Jon Herskowitz
Florida Bar No. 814032
**BARON & HERSKOWITZ**
9100 S. Dadeland Blvd.
Suite 1704
Miami, FL 33156
Telephone: (305) 670-0101
Facsimile: (305) 670-2393
jon@bhfloridalaw.com

William H. Anderson (to apply pro hac vice)
Rebecca P. Chang (to apply pro hac vice)
**HANDLEY FARAH & ANDERSON PLLC**
777 6th Street, NW—Eleventh Floor
Washington, DC 20001
Telephone: (202) 559-2433
Facsimile: (866)-912-8897
wanderson@hfajustice.com
rchang@hfajustice.com

Matthew D. Schelkopf
Joseph B. Kenney
**SAUDER SCHELKOPF**
555 Lancaster Avenue
Berwyn, PA 19312
Telephone: (888) 711-9975
Facsimile: (610) 421-1326
mds@sstriallawyers.com
jbk@sstriallawyers.com