UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-62646-CIV-ALTMAN

ERIC CARTER, *et al.*,

　　*Plaintiffs*,

*v.*

FORD MOTOR COMPANY,

　　*Defendant.*

_____/

## ORDER

　　Ford's F-series truck has been America's best-selling vehicle for the last 42 years. But the Plaintiffs—representing a putative nationwide class of F-150 owners—have highlighted (what they say is) a material defect in the F-150: a bubbling of the dashboard panel that affects the trucks' value. Alleging that Ford knew about the defect and failed to fix it, they've filed this lawsuit, in which they assert a farrago of false-advertising and consumer-protection, warranty, and Magnuson-Moss claims. Ford's Motion to Dismiss the complaint is now ripe for adjudication. This Order follows.

### THE FACTS

　　Ford has been designing, engineering, manufacturing, and selling automobiles for more than a century. *See* Second Amended Complaint ("SAC") [ECF No. 61] ¶ 110.[1] In the United States, Ford sells its vehicles through a network of authorized dealers. *See id.* ¶¶ 15, 110. The F-Series truck has been (by far) Ford's most successful and profitable vehicle—holding the top spot as America's best-selling truck for more than four decades and comprising nearly one-third of all pickup trucks sold in

_____

[1] We take these facts, as we must, from the allegations of the SAC.

the United States. *See id.* ¶¶ 111–12. To put it bluntly, a lot of people drive these trucks—and, as a result, these trucks have made Ford a lot of money. *See id.*

The Plaintiffs bring this putative class action on behalf of a nationwide class of current and former owners and lessees of 2015–20 Ford F-150 XL and XLT trucks.[2] *See id.* ¶ 1. While Ford offers its F-150 in several "trim levels"—N.B., depending on the trim level, an F-Series truck can cost you anywhere from $30,000 to over $67,000—the Plaintiffs' claims concern only two of these trim levels: the XL and XLT, which are (generally) the least expensive trim options. *See id.* ¶¶ 113–15. These Class Vehicles (the SAC alleges) are equipped with an instrument panel—commonly referred to as a dashboard—that's defective in that it's prone to warping or bubbling (the "Defect"). *See id.* ¶¶ 1–2, 113–15. This Defect most often manifests—in both the Class Vehicles' original dashboard ("Original Dash") and Ford's replacement dashboards ("New Dash")—in the areas around the defrost vents. *See id.* ¶ 2. In many cases, the dashboard has warped and peeled away from the truck's body within Ford's warranty period.[3] *See id.* ¶¶ 1–2.

By April 2015, Ford knew about the Defect because hundreds of F-150 drivers had complained about it *to* Ford. *See id.* ¶¶ 1–3, 120–28. Despite this knowledge, the Plaintiffs say, Ford has continued to sell the Class Vehicles without ever mentioning the Defect. *See id.* In 2018, Ford notified its dealers about the Defect and instructed them *not* to try to repair it. *See id.* ¶ 4. Again—as they had done for three years—Ford and its dealers decided not to disclose the Defect to consumers. *See id.* The next year (2019) Ford told its dealers to replace the Original Dash with a New Dash Ford was then manufacturing. *See id.* ¶ 5. Unfortunately, the SAC alleges, the New Dash—which uses the very same parts as the Old Dash—carries the same Defect. *See id.* ¶¶ 5–6. In other words, even though

---

[2] We'll refer to these trucks as the "Class Vehicles."
[3] These Class Vehicles come with a three-year/36,000-mile, bumper-to-bumper limited warranty. SAC ¶ 132.

the F-Series's other trim levels don't have the Defect—meaning that Ford was producing and installing very similar, non-defective dashboards in the more expensive trims of the same model truck—Ford elected not to use *that* dash on the Class Vehicles. *See id.* ¶¶ 5–6, 8. Instead, as we've said, Ford manufactured (and began installing) a New Dash that was *also* defective. *See id.* Still, according to the Plaintiffs, Ford refuses to offer the higher-grade dashboards as replacements for the Class Vehicles. *See id.* As a result, three of the named Plaintiffs—Glass, Linderman, and Wooding—had the Old Dash replaced with the New Dash, only to see the Defect appear *again* within a few weeks. *See id.* ¶¶ 6, 36–54, 93–97.

The eight named Plaintiffs each allege that they purchased or leased a new 2018 or 2019 Ford F-150 XL or XLT from an authorized Ford dealer.[4] *See id.* ¶¶ 18–88. The named Plaintiffs hail from four different states—Florida, Virginia, California, and Illinois—and seek to represent subclasses of residents from each of those states. *See id.* ¶¶ 17–97. They all allege that Ford failed to disclose the Defect to them. *See id.* Let's take a look at each of their claims in more detail.

Eric Carter, a Florida citizen who bought his car in Florida, alleges that, less than a month after he bought a 2019 F-150 XLT, he noticed that the Original Dash had begun to warp. *See id.* ¶¶ 17–26. Carter informed his authorized dealer, who promised to forward his complaint to Ford. *See id.* Carter also filed a report about the Defect on Ford's website. *See id.* About a month later, the dealership's service manager told Carter that he was waiting for Ford to issue a recall. *See id.* In the meantime, the manager said, there was nothing else the dealership could do. *See id.*

Mark Siracuse lives in Florida, where he purchased a 2018 F-150 XLT in November 2018. *See id.* ¶¶ 27–28. Within two months, Siracuse noticed that the Original Dash had started warping—so he notified the authorized dealer, who refused to repair the Defect. *See id.* ¶¶ 31–32. After Siracuse

---

[4] Although the SAC names *nine* Plaintiffs (and potential class representatives), one of these, Chris Weber, has since dismissed his claims. *See* Order of Dismissal as to Chris Weber [ECF No. 105].

completed a Ford survey, in which he described the Defect, the dealership offered to split the cost of the repair—which the dealership estimated at several thousand dollars. *See id.* Siracuse refused this offer and took the truck to his local Ford dealer—i.e., not the authorized Ford dealer that had sold him the truck—to whom he submitted a warranty repair request. *See id.* At some point later, the local dealer told him that the Defect couldn't be fixed and that Ford was still investigating the problem. *See id.* Siracuse also continued to correspond with the Ford dealer that had sold him the truck. *See id.* ¶ 33. Although that dealership finally agreed to cover the repair's *full* cost, it added *both* that the Defect couldn't be fixed *and* that any replacement dash, including the New Dash, would likewise warp. *See id.*

Like Siracuse and Carter, Michael Linderman, Stephen Michael Glass, and Drew Wooding live in Florida, where they purchased their 2018 F-150 XLTs. *See id.* ¶¶ 36–54, 87–97. Linderman had only driven 118 miles in his new truck when he noticed the Defect. *See id.* ¶ 40. Glass had only had the vehicle for a few months when he noticed it. *See id.* ¶¶ 45–51. Wooding saw the Defect within a month of his purchase—and with only 800 miles on the odometer. *See id.* ¶ 91. Linderman, Glass, and Wooding all informed their authorized Ford dealers about the Defect and eventually had their Original Dashes replaced with New Dashes. *See id.* ¶¶ 36–54, 87–97. But, within a few weeks of their replacements, both Linderman and Glass noticed that their New Dashes also had the Defect. *See id.* Wooding, for his part, noticed the Defect in the New Dash almost immediately. *See id.* ¶¶ 93–94. Glass told the Ford dealer about the New Dash's Defect and asked for warranty coverage, which the dealership promptly denied. *See id.* ¶¶ 52, 94. Glass then contacted Ford national customer service about the Defect and requested warranty coverage. *See id.* In response, Ford instructed Glass to return to the dealership and to renew his request for coverage. *See id.* But, when he did so, the dealer's service advisor told him that any replacement would be pointless because that replacement would also warp and (sometimes) rattle. *See id.* Unlike Glass, no one told Wooding that another replacement would be worthless. *See id.* ¶¶ 87–97. When Wooding told his Ford dealer about the New Dash having the same

Defect, the dealership again directed Wooding to contact Ford's customer service line. *See id.* Ford agreed to replace the New Dash (with another New Dash). *See id.* ¶¶ 93–94. Unfortunately, the second New Dash also bore the Defect. *See id.* ¶¶ 94–95. When Wooding told Ford about the Defect a third time, Ford refused to help with any further repairs. *See id.*

Joey Mendoza, a California resident, leased a 2018 F-150 XLT in May 2018 from an authorized Ford dealer in California. *See id.* ¶¶ 55–56. By September 2018, Mendoza had noticed that the Original Dash, which had begun to warp, creaked or rattled as he drove. *See id.* ¶ 59. Mendoza repeatedly asked his Ford dealership about repairing the dash and, each time, was refused. *See id.* ¶ 60. When Mendoza called Ford's national customer service line about the Defect and requested warranty coverage, Ford admitted that the Defect couldn't be fixed and refused to attempt a repair. *See id.* ¶ 61. Mendoza later learned about a 2018 announcement—an announcement Ford made *before* Mendoza called the national customer service line—in which Ford recommended replacing the Original Dash with the New Dash. *See id.* ¶ 62. Armed with this announcement, Mendoza called the Ford national customer service line again. *Id.* This time, Ford agreed to put him on a waiting list for the repair—though Ford refused to say how long it would take to get the repair done. *Id.*

Julie Deakin lives in Illinois. *See id.* ¶ 65. In June 2018, she bought a 2018 F-150 XLT from an Illinois Ford dealership. *See id.* ¶¶ 65–66. By September, the Original Dash in Deakin's truck had begun to warp, buckling and peeling away near the defrost vents. *See id.* ¶ 69. When Deakin requested warranty coverage, her Ford dealership told her that Ford was working on a solution. *See id.* ¶ 70. Deakin repeatedly checked in with her dealership about Ford's work on a potential fix. *See id.* ¶ 71. In November 2018, Deakin visited her dealership, where she learned that Ford had known about the Defect *before* her purchase. *See id.* ¶¶ 71–72. Eventually, Deakin contacted Ford's national customer service line about the Defect. *See id.* ¶ 73. Eight months later—in August 2019—Deakin followed up with Ford and discovered that Ford had no record of her need for a repair. *See id.* Ford told Deakin

that her dealership would receive a New Dash for her truck in the next six to eight weeks—though it failed to add that the New Dash would suffer from the same Defect. *See id.* As of the filing of the SAC, Deakin was still waiting for Ford to install her New Dash. *See id.*

Finally, Michael Zelaska bought his 2018 F-150 XLT in September 2018 in his home state of Virginia. *See id.* ¶¶ 76–77. Before the end of that year, Zelaska realized that the Original Dash had warped and pulled away from the defrost vents. *See id.* ¶ 80. When he contacted a Ford dealership about the Defect, the representative said that Ford had instructed its dealerships *not* to attempt a repair. *See id.* ¶ 81. Shortly thereafter, Zelaska reached out to Ford's national customer service line to request a warranty repair for the Original Dash. *See id.* ¶ 82. During this conversation, Zelaska spoke with several Ford representatives whose stories appeared to change over time. *See id.* First, they told him that Ford had no repair for the Defect. *See id.* Then, they said that a repair "would not make a difference." *Id.* The reps refused Zelaska's repeated requests to speak with a manager—or for their contact information. *See id.* Finally, Zelaska was told that Ford's regional customer service representative would reach out to him and that a dealership would separately contact him once a repair became available. *See id.* No Ford employee ever followed up with Zelaska—even after the New Dash became available. *See id.* ¶ 83. Nevertheless, Zelaska persisted. After hearing about the New Dash, he returned to a Ford dealership to ask about having it installed. *See id.* ¶ 84. The dealership promised to replace the Original Dash once Ford approved Zelaska's warranty claim. *See id.* Several weeks later, the dealership told Zelaska that there was no timeframe for the repair because the New Dash's parts were on a national backorder. *See id.* As of the filing of the SAC, Zelaska was still waiting for a New Dash. *See id.*

## THE LAW

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).

To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (alteration added) (citing *Twombly*, 550 U.S. at 556). "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citation omitted), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012). The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 545).

On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016). Unsupported factual allegations and legal conclusions, however, receive no such deference. *See Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). A complaint's "well-pled allegations must 'nudge the claims across the line from conceivable to plausible.'" *Hays v. Page Perry, LLC*, 627 F. App'x 892, 896 (11th Cir. 2015) (cleaned up) (quoting *Twombly*, 550 U.S. at 555, 570).

**ANALYSIS**

The SAC asserts 11 counts against Ford. *See generally* SAC. For ease of analysis, we divide these counts into three categories: (1) the non-Florida (i.e., the Illinois, Virginia, and California) state-law claims (Counts IV–XI), SAC ¶¶ 191–277; (2) the Florida state-law claims (Counts II & III), *id.* ¶¶ 168–90; and (3) the Magnuson-Moss Warranty Act claim (Count I), *id.* ¶¶ 154–67. Ford has moved to dismiss all 11 counts. *See generally* Motion to Dismiss ("Motion") [ECF No. 71].[5] We address each category in turn.

## I.      The Non-Florida Plaintiffs' Claims (Counts IV–XI)

Ford has moved to dismiss Counts IV–XI—the non-Florida Plaintiffs' claims—for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). *See* Motion at 4–7. Here, Ford says that it isn't subject to general jurisdiction in Florida—a proposition the Plaintiffs do not dispute, *see* Response at 4 n.2. Ford also argues that this Court may not exercise specific jurisdiction over the non-Florida Plaintiffs' claims. *See* Motion at 4–7. We agree.

"The determination of personal jurisdiction over a nonresident defendant requires a two-part analysis by the federal courts." *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 855 (11th Cir. 1990); *see also PVC Windoors, Inc. v. Babbitbay Beach Const., N.V.*, 598 F.3d 802, 807 (11th Cir. 2010) ("We undertake a two-step inquiry to determine whether the exercise of personal jurisdiction over a nonresident defendant is proper."). *First*, the Court must satisfy itself that the exercise of personal jurisdiction comports with the forum state's long-arm statute. *See Proudfoot Co. World Headquarters L.P. v. Thayer*, 877 F.2d 912, 919 (11th Cir. 1989). *Second*, the Court must ensure that the exercise of jurisdiction is consistent with the requirements of the Due Process Clause of the Fourteenth Amendment. *See Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1214 (11th Cir. 1999).

---

[5] The Motion is now ripe for adjudication. *See* Response [ECF No. 73]; Reply [ECF No. 80].

Notably, Florida's long-arm statute—Section 48.193(1)(a)—"requires more activities or contacts to sustain service of process than are . . . required by decisions of the Supreme Court of the United States." *Citizens State Bank v. Winters Gov't Secs. Corp.*, 361 So. 2d 760, 762 (Fla. 4th DCA 1978). The Plaintiffs, in other words, "must establish that *both* the statutory and the due process requirements for specific jurisdiction have been met, and their failure with respect to the former precludes the assertion of specific jurisdiction over [the defendant] under Florida's long-arm statute." *Fraser v. Smith*, 594 F.3d 842, 848 (11th Cir. 2010) (emphasis added & cleaned up).

Starting with the first step, under Florida law, "[a] plaintiff seeking to obtain jurisdiction over a non-resident defendant initially need only allege sufficient facts to make out a prima facie case of jurisdiction." *Posner*, 178 F.3d at 1214 (cleaned up). "Plaintiff's burden in alleging personal jurisdiction is to plead sufficient material facts to establish the basis for exercise of such jurisdiction." *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000). If a plaintiff pleads enough "material facts" to support the exercise of personal jurisdiction, the burden then shifts to the defendant to challenge the plaintiff's allegations with affidavits or other competent evidence. *Id.* "When a nonresident defendant raises a meritorious defense to personal jurisdiction through affidavits, documents or testimony," the plaintiff must establish the propriety of jurisdiction by affidavits, testimony, or other documents. *Am. Airlines, Inc. v. Despegar.com USA, Inc.*, 2014 WL 11880999, at *3 (S.D. Fla. May 14, 2014) (Altonaga, J.) (cleaned up). In other words, the "district court must accept the facts alleged in the complaint as true, to the extent that they are uncontroverted by the defendant's affidavits." *Cable/Home Commc'n Corp.*, 902 F.2d at 855. But, when "the parties' affidavit and deposition evidence conflict, the district court must construe all reasonable inferences in favor of the plaintiff." *Id.*

If the Plaintiffs can satisfy the strictures of Florida's long-arm statute, then we must decide whether the exercise of personal jurisdiction comports with due process. "Subjecting [a defendant] to

jurisdiction in Florida comports with due process so long as 'minimum contacts exist between [the defendant] and Florida and exercising jurisdiction does not offend traditional notions of fair play and substantial justice." *Id.* at 1220 (cleaned up). These "minimum contacts" "must be based on an act of the defendant," *Asahi Metal Indus. Co., v. Super. Ct. of Cal., Solano Cty.*, 480 U.S. 102, 109 (1987), and focuses "on the relationship among the defendant, the forum, and the litigation[,]" *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 775 (1984). "[T]o exercise jurisdiction consistent with due process," then, "the defendant's suit-related conduct must create a substantial connection with the forum State [of Florida]." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). This "relationship must arise out of contacts that the defendant *himself* creates with the forum State[.]" *Id.* (cleaned up); *see also Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013) ("In specific personal jurisdiction cases, we apply the three-part due process test, which examines: (1) whether the plaintiff's claims arise out of or relate to at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant purposefully availed himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice." (cleaned up)).

## A.       The Florida Long-Arm Statute

The non-Florida Plaintiffs' claims fail under any straightforward application of Florida's long-arm statute. *See* FLA. STAT. § 48.193(1)(a); *Carmouche v. Tamborlee Mgmt., Inc.*, 789 F.3d 1201, 1204 (11th Cir. 2015) (noting that Florida's long-arm statute "lists acts that subject a defendant to *specific* personal jurisdiction—that is, jurisdiction over suits that arise out of or relate to a defendant's contacts with Florida"). Under Florida's long-arm statute, parties submit themselves and their representatives "to the jurisdiction of the courts of this state for any cause of action *arising from*[,]" in relevant part, the following:

> 1. Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.

> 2. Committing a tortious act within this state
> . . .
> 6. Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury, either:
>> a. The defendant was engaged in solicitation or service activities within this state; or
>> b. Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.
> 7. Breaching a contract in this state by failing to perform acts required by the contract to be performed in this state.

FLA. STAT. § 48.193(1)(a) (emphasis added). In other words, Florida's long-arm statute only hales defendants into Florida's courts when the plaintiff's cause of action arises from the defendant's purposeful contacts with Florida. *Id.*

The SAC doesn't meet these criteria because it fails to connect the non-Florida Plaintiffs' claims to Florida *in any way*.[6] *See* SAC ¶¶ 1–153. These Plaintiffs all live outside of Florida; they bought their cars outside of Florida; they received their warranties outside of Florida; they were (allegedly) defrauded outside of Florida; their defects manifested outside of Florida; they complained to their dealerships outside of Florida; they got replacement Dashes outside of Florida; and those New Dashes

---

[6] The SAC does allege that (1) "[t]his court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367," SAC ¶ 14; that (2) "Defendant sells Class Vehicles through a network of authorized dealers throughout the United States, including in Florida. Defendant purposefully avails itself of the Florida consumer market, distributing vehicles, and disseminating advertising in Florida," *id.* ¶ 15; and that (3) "Ford designs, engineers, manufactures and sells vehicles in this District [the Southern District of Florida] and throughout the United States through its network of authorized motor vehicle dealers," *id.* ¶ 110. But the latter two allegations have nothing to do with the non-Florida Plaintiffs' claims—which indisputably arose in California, Virginia, and Illinois (respectively). And the Plaintiffs have waived any reliance on the first allegation by not advancing any such argument in their Response. *See, e.g., Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it.")). Nor could that allegation have had any bearing here because § 1367 concerns subject-matter—not personal—jurisdiction.

failed outside of Florida. Given these allegations, there's really not much more to say here.[7] *See, e.g.,*
*Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1314–15 (11th Cir. 2018) (explaining that, when evaluating
the exercise of specific jurisdiction, a court "must decide whether the [plaintiffs'] claims arise out of
or relate to one of [the defendant's] contacts with Florida," and adding that, "[i]n the absence of such
a connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected
activities in the State" (cleaned up)); *Fraser*, 594 F.3d at 850 ("A fundamental element of the specific
jurisdiction calculus is that plaintiff's claim must arise out of or relate to at least one of the defendant's
contacts with the forum." (cleaned up)).

## B.      The Plaintiffs' Arguments

In their Response, the Plaintiffs advance three arguments for specific personal jurisdiction in
Florida—all unavailing.

### 1. Argument 1: The Slippery Slope

*First*, the Plaintiffs say that, because this Court has jurisdiction over Ford for the *Florida*
Plaintiffs' claims, "it also has specific personal jurisdiction over Ford for *unnamed*, non-resident
Plaintiffs' claims in the class." Response at 5–6 (emphasis added). This sentence is a bit misleading
because no one is disputing—at least not yet—the Court's jurisdiction over the claims of *unnamed* class
members, whether in or outside of Florida. But, for purposes of dispensing with the Plaintiffs' *first*
argument, that distinction is beside the point because, in the Plaintiffs' view, "the practical impact of
disallowing non-resident *named* plaintiff claims to proceed is to effectively dismiss the claims of the
non-resident putative Class Members." *Id.* at 7 n.5 (emphasis added). Why? Because a class without
non-Florida Plaintiffs would "mean that a 'national class' would be limited to consumers with a Florida

---

[7] The non-Florida Plaintiffs' claims would fail Step Two of the personal jurisdiction test (the due
process inquiry) for the same reason—the lack of any connection between the cause of action and the
forum state.

based breach of warranty claim"—a result that (the Plaintiffs insist) "undermines basic notions of judicial economy by forcing Plaintiffs to file cases all over the country[.]" *Id.*

For three reasons, we need not follow the Plaintiffs down the slippery slope they warn us about. *One*, the Plaintiffs could always bring their nationwide class action *either* in Delaware (where Ford is incorporated) *or* in Michigan (where Ford has its principal place of business). *Cf. Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) ("For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home. With respect to a corporation, the place of incorporation and principal place of business are paradigm bases for general jurisdiction." (cleaned up)); *Waite*, 901 F.3d at 1317 ("The paradigm all-purpose forums in which a corporation is at home are the corporation's place of incorporation and its principal place of business. Outside of these two exemplars, a defendant's operations will be so substantial and of such a nature as to render the corporation at home in that State only in an exceptional case." (cleaned up)).[8]

*Two*, if the Plaintiffs really wanted their nationwide class action here in Florida, they could have filed two parallel cases—a Florida class in Florida and a 49-state, non-Florida class in either Delaware or Michigan. The Plaintiffs could then ask Ford to accede to a transfer of the 49-state case to Florida for consolidation. And, as this Court explained at oral argument, Ford—which would otherwise be forced to pay two sets of lawyers in two different jurisdictions to litigate two identical and parallel cases—would have a powerful incentive *to agree*. At that point, the Plaintiffs could have their cake and

---

[8] *See also Bristol-Myers Squibb Co. v. Super. Ct. of Ca., S.F. Cty.*, 137 S. Ct. 1773, 1783 (2017) ("Our straightforward application in this case of settled principles of personal jurisdiction will not result in the parade of horribles that respondents conjure up. Our decision does not prevent the California and out-of-state plaintiffs from joining together in a consolidated action in the States that have general jurisdiction over BMS. BMS concedes that such suits could be brought in either New York or Delaware." (cleaned up)).

eat it, too: They'd have their nationwide class consolidated before a Florida judge—without any risk of a *Bristol-Myers*-infused motion to dismiss the non-Florida Plaintiffs' claims.

*Three*, even without these procedural gambits, the Florida Plaintiffs could still assert the claims of *unnamed*, non-Florida class members. Since the whole arsenal of 12(b)(2) arguments Ford has deployed—Florida's long-arm statute, *Bristol-Myers*, and the Fourteenth Amendment's Due Process Clause—only apply to the *named* Plaintiffs' claims, the Florida Plaintiffs will still have their chance, under Rule 23, to represent the *unnamed*, non-Florida class members. And, indeed, the structure and theory of the SAC appears to concede this point: After all, despite advancing the claims of only *three* non-state Plaintiffs (from California, Virginia, and Illinois), the SAC purports to represent *unnamed* class members from *all* 50 states. *See* SAC ¶ 144; Response at 3. The SAC's confidence in the claims of class members from the remaining 46[9] states thus belies the doomsday predictions the Plaintiffs have offered us here.

### 2. Argument 2: The Pendent Personal Jurisdiction Doctrine

*Second*, the Plaintiffs ask this Court to "exercise pendent personal jurisdiction over all non-resident named Plaintiffs' claims."[10] Response at 7. Under the doctrine of pendent-*claim*[11] personal jurisdiction, "a court may assert pendent personal jurisdiction over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts." *Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004).[12] It's true that the class members' claims all seem to arise from the same latent Defect in

---

[9] (minus Florida, California, Virginia, and Illinois).

[10] The Plaintiffs interchangeably refer to this doctrine as "pendent personal jurisdiction" and "pendent jurisdiction." *See, e.g.*, Response at 3 (asking this Court "to exercise pendent jurisdiction over Ford for the claims of all non-resident named Plaintiffs, as all Plaintiffs' claims arise from a common nucleus of operative fact"). As we'll see in a moment, the doctrine is quite a bit more complicated than that.

[11] Much more on this modifier below.

[12] *See also Rolls-Royce Corp. v. Heros, Inc.*, 576 F. Supp. 2d 765, 783 (N.D. Tex. 2008) ("Pendent[-claim] personal jurisdiction, like its better known cousin, supplemental subject matter jurisdiction, exists

the same trim and model of F-150 trucks, which resulted in breaches of the same Ford warranties. *See* Response at 3–4. Nevertheless, for *three* reasons, the Court declines to exercise pendent-*party* personal jurisdiction over the claims of the non-Florida Plaintiffs here.

> **a.   Reason 1: The Eleventh Circuit Hasn't Adopted the Doctrine of Pendent-*Party* Personal Jurisdiction**

We start with the obvious. Unlike supplemental jurisdiction, *see* 28 U.S.C. § 1367, there is no pendent *personal* jurisdiction statute. *See* 4A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1069.7 (4th ed. 2020) ("Since there is no federal statute on this subject, it seems clear that if it exists, pendent *personal* jurisdiction must be a creature of federal common law, or 'judge made,' as one court put it." (emphasis added)). Without statutory authority, this Court must rely on guidance from the Eleventh Circuit. And, as of this writing, the Eleventh Circuit hasn't adopted the version of pendent personal jurisdiction (what we'll call pendent-*party* personal jurisdiction) the Plaintiffs espouse here.

Before we get into all that, though, we must define our terms. In doing so, we should distinguish the doctrine of pendent *personal* jurisdiction—at issue here—from the constitutionally distinct doctrines of pendent-party (subject-matter) jurisdiction and pendent-claim (subject-matter) jurisdiction.[13] The latter two, of course, are the two different flavors of pendent *subject-matter*

---

when a court possesses personal jurisdiction over a defendant for one claim, lacks an independent basis for personal jurisdiction over the defendant for another claim that arises out of the same nucleus of operative fact, and then, because it possesses personal jurisdiction over the first claim, asserts personal jurisdiction over the second claim." (quoting *United States v. Botefuhr*, 309 F.3d 1263, 1272–73 (10th Cir. 2002)).

[13] Some district courts, it's true, have muddled the distinction between pendent personal, pendent-party, pendent-claim, and supplemental jurisdiction by, for instance, referring to what we now call "pendent personal jurisdiction" as "pendent party jurisdiction." But the federal appellate cases from which these terms originate—like *Action Embroidery*—have consistently referred to the version at issue here as "pendent personal jurisdiction." *See, e.g., Action Embroidery*, 368 F.3d at 1176 ([W]e join our sister circuits and adopt the doctrine of 'pendent personal jurisdiction.'"); *IUE AFL-CIO Pension Fund v. Hermann*, 9 F.3d 1049, 1056 (2d Cir. 1993) ("[U]nder the doctrine of pendent personal jurisdiction, where a federal statute authorizes nationwide service of process, and the federal and state claims derive

jurisdiction now referred to as "supplemental jurisdiction" and codified at 28 U.S.C. § 1367. *See* Barbara J. Van Arsdale et al., Federal Procedure § 1:27 (Lawyers ed. Mar. 2021) ("Supplemental jurisdiction under 28 U.S.C.A. § 1367 is the codification of the judicially developed concepts of pendent-claim, pendent-party, and ancillary jurisdiction.").[14] The "question of pendent claim [subject-matter] jurisdiction arises when a plaintiff who brings a federal cause of action in federal court asks that federal court to entertain a related state law claim against the same defendant." *Ortega v. Schramm*, 922 F.2d 684, 688 (11th Cir. 1991). Meanwhile, the doctrine of pendent-party (subject-matter) jurisdiction concerns "whether a nonfederal claim can serve as the basis for joining a party over whom the court has no independent basis for federal subject matter jurisdiction, simply by virtue of the fact that the nonfederal claim arises from the 'common nucleus of operative fact' giving rise to the federal claim." *Id.* at 689. And, since Congress passed § 1367 in 1990, the Eleventh Circuit has recognized the doctrine of "supplemental jurisdiction" as encompassing both "what was traditionally known as pendent claim jurisdiction" and "what was formerly known as pendent party jurisdiction as well." *Palmer v. Hospital Auth. of Randolph Cty.*, 22 F.3d 1559, 1566–67 (11th Cir. 1994); *see also PTA-FLA, Inc. v. ZTE USA, Inc.*, 844 F.3d 1299, 1309–10 (11th Cir. 2016) (explaining that, "[i]n enacting § 1367, Congress heeded advice from the Federal Courts Study Committee" to "authorize federal courts to hear any claim arising out of the same transaction or occurrence as a claim within federal

---

from a common nucleus of operative fact, the district court may assert personal jurisdiction over the parties to the related state law claims even if personal jurisdiction is not otherwise available.").

[14] *See also In re Bayou Shores SNF, LLC*, 828 F.3d 1297, 1318 n.33 (11th Cir. 2016) ("'Pendent-party' jurisdiction is 'jurisdiction over parties not named in any claim that is independently cognizable by [a] federal court. As opposed to 'pendent-claim' jurisdiction, which is 'jurisdiction over nonfederal claims between parties litigating other matters properly before the court.'" (quoting *Finley v. United States*, 490 U.S. 545, 548 (1989), *superseded by statute*, Judicial Improvements Act of 1990, 104 Stat. 5089, *as recognized in Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005) ("All parties to this litigation and all courts to consider the question agree that § 1367 overturned the result in *Finley*."))).

jurisdiction," which was "broad enough to encompass pendent claim, pendent party, and ancillary jurisdiction." (cleaned up)).

So, that's supplemental jurisdiction—or, to use a more antiquated phraseology, the *subject-matter* component of pendent jurisdiction. Our case, however, involves the separate doctrine of pendent *personal* jurisdiction—which, no less than pendent *subject-matter* jurisdiction, encompasses two distinct scenarios: pendent-*claim* personal jurisdiction and pendent-*party* personal jurisdiction. We can quickly illustrate the differences between these two scenarios with two simple examples. In Scenario One, Plaintiff A brings Claim 1 (over which the Court may exercise personal jurisdiction) and Claim 2 (over which the Court has no independent basis to assert personal jurisdiction) against Defendant Z. If both claims arise from the same common nucleus of operative facts, Claim 1's jurisdictional anchor allows the court to exercise jurisdiction over Claim 2. This is what, drawing from the nomenclature of supplemental jurisdiction, we'll refer to as pendent-*claim* personal jurisdiction. And it's the flavor of pendent personal jurisdiction that just about every federal circuit court of appeals— including the Eleventh Circuit—has adopted. *See Thomas v. Brown*, 504 F. App'x 845, 847 (11th Cir. 2013) ("If the forum's long-arm statute provides jurisdiction over one claim, the district court has personal jurisdiction over the entire case so long as the claims arose from the same jurisdiction-generating event." (citing *Cronin v. Washington Nat. Ins. Co.*, 980 F.2d 663, 671 (11th Cir. 1993)); *Cronin*, 980 F.2d at 671 (observing, in an action by a non-resident injured in Florida against the insurer and the broker, that the Florida long-arm statute "provides personal jurisdiction over the contract claim but arguably not the negligence claims," but holding that, "because all of the claims arose from the same jurisdiction generating event, [defendant] Cargill's alleged failure to provide [plaintiff] Cronin with health insurance, the district court had personal jurisdiction over the entire case"); *Action Embroidery*, 368 F.3d at 1180 (citing cases from the Second, Third, Seventh, Tenth, and D.C. Circuits and observing that "[m]any of our sister circuits have adopted the doctrine of 'pendent[-claim]

personal jurisdiction.'"); *Rolls-Royce Corp. v. Heros, Inc.*, 576 F. Supp. 2d 765, 783 (N.D. Tex. 2008) (collecting cases from the Federal, Second, Third, Seventh, Tenth, and D.C. Circuits—all of which have adopted the pendent-*claim* personal jurisdiction doctrine). So far, so good.

In Scenario Two, by contrast, Plaintiff A asserts Claim 1 (over which the Court can exercise personal jurisdiction) against Defendant Z. Then, Plaintiff B advances Claim 2 (over which, though it arises from the same common nucleus of operative facts as Claim 1, the court has *no* personal jurisdiction) against Defendant Z—thus trying to piggyback onto Plaintiff A's jurisdictional hook. So far as this Court is aware, *no* federal circuit court of appeals has adopted this pendent-*party* variety of personal jurisdiction. And the Plaintiffs—who bear the burden of establishing this Court's jurisdiction[15]—never suggest otherwise. *See generally* Response.

Admittedly, a few district courts—all outside this Circuit—*have* adopted this doctrine of pendent-party personal jurisdiction. *See, e.g., Allen v. ConAgra Foods, Inc.*, 2018 WL 6460451, at *7 (N.D. Cal. Dec. 10, 2018); *In re Packaged Seafood Prods. Antitrust Litig.*, 338 F. Supp. 3d 1118, 1172–73 (S.D. Cal. 2018).[16] But the better-reasoned view from our Circuit appears to be the one the Middle District

---

[15] *See Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1217 (11th Cir. 2009) ("It goes without saying that, where the defendant challenges the court's exercise of jurisdiction over its person, the plaintiff bears the ultimate burden of establishing that personal jurisdiction is present."); *AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1364 (11th Cir. 2021) ("While the plaintiff bears the burden of establishing personal jurisdiction, the plaintiff's burden of proof varies according to how the district court chooses to proceed. ... No matter how the district court proceeds, the plaintiff must eventually—by the close of evidence—establish personal jurisdiction by a preponderance of the evidence."); *S & Davis Int'l., Inc. v. Republic of Yemen*, 218 F.3d 1292, 1303 (11th Cir. 2000) ("The plaintiff bears the burden of establishing personal jurisdiction over the defendant." (quoting *Taylor v. Phelan*, 912 F.2d 429, 431 (10th Cir. 1990))); *Cable/Home Commc'n Corp.*, 902 F.2d at 855 ("When the district court does not conduct a discretionary hearing on a motion to dismiss for lack of personal jurisdiction, the plaintiff must establish a prima facie case of personal jurisdiction over the nonresident defendant.").

[16] Even these two cases, though, applied the doctrine in factually-distinct circumstances. The complaint in *Packaged Seafood*, for instance (unlike our SAC), *did* assert several federal-question claims—including claims under the Sherman and Clayton Acts, which indisputably provided for nationwide service of process. *See* 338 F. Supp. 3d at 1172–73 ("Pendent personal jurisdiction is appropriate here. The Court has before it federal question claims arising out of the Clayton and

of Florida expressed in *Story v. Heartland Payment Sys., LLC*, 461 F. Supp. 3d 1216, 1229 (M.D. Fla. 2020)—namely: "What plaintiffs here propose is that the Court expand the doctrine to include additional pendent *party plaintiffs*, not just pendent *claims*." As the plaintiffs did in *Story*, our Plaintiffs "argue the rationale is essentially the same—if a defendant will be in the forum defending claims brought by resident Florida named plaintiffs over which the Court can exercise personal jurisdiction, the Court should be able to exercise personal jurisdiction over similar claims against the same defendant brought by non-resident plaintiffs." *Id.* at 1229–30; *see* Response at 7–10. As in *Story*, however, our Plaintiffs—who, again, bear the burden here—have failed to cite a single case from this Circuit for their theory of pendent-*party* personal jurisdiction. *See* Response at 7–10; *cf. Story*, 461 F. Supp. 3d at 1230 ("But the Court did not uncover (and the parties did not cite) any Eleventh Circuit authority adopting this theory.").

Indeed, even beyond this Circuit, federal courts generally decline to apply pendent-*party* personal jurisdiction to "situations like the one here where [p]laintiffs seek to piggyback personal jurisdiction over one set of [p]laintiffs' claims (the non-California plaintiffs) onto claims by a different set of plaintiffs (the California plaintiffs) notwithstanding that the former do not arise from or relate to [d]efendants' contacts in the forum state." *Prime Healthcare Centinela, LLC v. Kimberly-Clark Corp.*, 2016 WL 7177532, at *2 (C.D. Cal. May 26, 2016).

---

Sherman Antitrust Acts, which provide for nationwide personal jurisdiction." (cleaned up)). And, while it's true that "the Indirect Plaintiffs" in *Packaged Seafood* "d[id] not bring a federal question cause of action, pendent personal jurisdiction" was "appropriate because the other Plaintiffs allege federal causes of action." *Id.* at 1173. In *Allen*, the court had initially agreed to exercise pendent-party personal jurisdiction in a diversity case over the non-resident named plaintiffs' claims. *See Allen*, 2018 WL 6460451, at *7. But it did so only because the plaintiffs represented a putative nationwide class. *Id.* at *8. Later, after the court denied the plaintiffs' motion for class certification, it *refused* to exercise pendent-party personal jurisdiction over the non-forum plaintiffs' claims. *See Allen*, 2019 WL 5191009, at *3 ("Now that plaintiffs have failed to achieve certification of a nationwide class, the foundation for my decision to exercise of [sic] pendent personal jurisdiction is no longer present. The potential for greater efficiency and the avoidance of piecemeal litigation are not enough. It is no longer appropriate to allow the non-California plaintiffs to proceed in this Court; I will dismiss their claims.").

One *could* advocate—though the Plaintiffs never get this far—for some parity in the way we apply pendent jurisdiction. Why—one might ask—should we treat personal and subject-matter jurisdiction differently when it comes to how well they receive pendent *parties*? Or, to put it slightly differently, if pendent parties are welcome in the world of subject-matter jurisdiction, perhaps they should be no less welcome in the context of personal jurisdiction. As with other meretricious arguments, however, this one breaks down on closer inspection.

As the Supreme Court has explained, "the jurisdictional limits that Art. III of the Constitution places on the federal courts relate to subject-matter jurisdiction only." *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 103 (1987). Thus, "although Art. III, § 1, leaves it to Congress to 'ordain and establish' inferior federal courts, the only limits on those courts, once established, in their exercise of personal jurisdiction, relate to due process." *Id.* "The requirement that a court have personal jurisdiction," in short, "flows not from Art. III, but from the Due Process Clause. It represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty." *Id.* at 104 (cleaned up). And this distinction in constitutional pedigree matters. After all, while we might agree that a federal court has the constitutional power to exercise jurisdiction over related claims *and* parties so long as those claims and parties appear in the same "case[] or controvers[y]" (the purview of subject-matter jurisdiction), we might be justifiably more solicitous of a defendant's "individual liberty" interest in avoiding lawsuits in forums that have no connection to the plaintiffs (personal jurisdiction).

Now, of course, Congress may limit or expand the *subject-matter* jurisdiction of federal courts, so long as it hews to the boundaries set by Article III, *see* U.S. CONST. art. III, § 1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress

may from time to time ordain and establish.")[17]—as it did, for instance, by passing the supplemental-jurisdiction statute, § 1367, which "overturned" the Supreme Court's decision in *Finley*, *see Exxon Mobil Corp.*, 545 U.S. at 558. But, as the *Omni* Court suggested, Congress cannot expand the *personal* jurisdiction of federal courts in a way that *reduces* the "individual liberty" interests of civil defendants below the constitutional floor established by the due process clauses of the Fifth and Fourteenth Amendments.

Where, though, should we draw that line—the line that, in the sphere of pendent personal jurisdiction, demarcates the constitutional floor below which we may not go. Here, as we've hinted, the federal circuit courts have (thus far) been willing to go only as far as the doctrine of pendent-*claim* personal jurisdiction allows. That is, the appellate courts have authorized federal judges to exercise personal jurisdiction in Scenario One cases but not in Scenario Two. Why this line? Well, we could speculate: Burdening the defendant with additional claims by a single plaintiff is one thing; burdening that same defendant with the innumerable claims of innumerable other plaintiffs with no connection to the forum is quite another. These plaintiffs will all need to be deposed, their friends and family members questioned, their products inspected. And, to the extent that these pendent plaintiffs are likely to be dispersed across the country, one can easily see the substantial additional burdens defendants will face from a more expansive application of pendent-*party* (as opposed to pendent-*claim*) personal jurisdiction.

---

[17] *See also, e.g.*, *United States v. Denedo*, 566 U.S. 904, 912 (2009) ("Assuming no constraints or limitations grounded in the Constitution are implicated, it is for Congress to determine the subject-matter jurisdiction of federal courts." (citing *Bowles v. Russell*, 551 U.S. 205, 212 (2007)); *Bowles*, 551 U.S. at 212 ("Within constitutional bounds, Congress decides what cases the federal courts have jurisdiction to consider."); *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 491 (1983) ("This Court's cases firmly establish that Congress may not expand the jurisdiction of the federal courts beyond the bounds established by the Constitution.").

But we needn't speculate today because the Supreme Court has drawn the line for us in a way that forecloses the Plaintiffs' position in cases arising under the due process clause of the Fourteenth Amendment.

### b.   Reason 2: *Bristol-Myers*

Which brings us to *Bristol-Myers*, where the Supreme Court held that "[t]he mere fact that *other* plaintiffs were prescribed, obtained, and ingested Plavix in California—and allegedly sustained the same injuries as did the nonresidents—does not allow the State [of California] to assert specific jurisdiction over the nonresidents' claims." 137 S. Ct. at 1781 (cleaned up). As the Court explained, "a defendant's relationship with a third party, standing alone, is an insufficient basis for jurisdiction. This remains true even when third parties (here, the plaintiffs who reside in California) can bring claims similar to those brought by the nonresidents." *Id.*[18]

Admittedly, as the Plaintiffs note, because *Bristol-Myers* involved a consolidated mass tort— rather than a class action—the Court refused to "confront the question whether [the Court's] opinion . . . would also apply to a class action in which a plaintiff injured in the forum State seeks to represent a nationwide class of plaintiffs, not all of whom were injured there." *Id.* at 1789. And, on this open question—whether *Bristol-Myers* applies to the claims of *unnamed* class members—the district

---

[18] In *Ford Motor Co. v. Montana Eighth Judicial Dist. Court*, the Supreme Court reaffirmed the central holding of *Bristol-Myers*. *See* 592 U.S., __ (2021) (slip op., at 16) (characterizing *Bristol-Myers* as holding that the trial court's exercise of jurisdiction over the non-California plaintiffs' claims was improper "because the forum State, and the defendant's activities there, lacked any connection to [those] claims."). *Ford* is significant because it clarified that a defendant's in-state contacts needn't *cause* the plaintiff's injury. *See id.* ("None of our precedents has suggested that only a strict causal relationship between the defendant's in-state activity and litigation will do. As just noted, our most common formulation of the rule demands that the suit 'arise out of *or relate to* the defendant's contacts with the forum.' The first half of that standard asks about causation; but the back half, after the 'or,' contemplates that some relationships will support jurisdiction without a causal showing." (quoting *Bristol-Myers*, 582 U.S., at __ (slip op., at 5))). But *Ford* doesn't affect the outcome in our case because, as we've said, there is no "connection" between Ford's Florida contacts and the non-Florida Plaintiffs' claims.

courts in this Circuit are decidedly split. *See, e.g., Becker v. HBN Media, Inc.*, 314 F. Supp. 3d 1342, 1344 (S.D. Fla. 2018) ("[T]here is a split of authority regarding whether *Bristol-Myers* should be read to hold a district court in Florida lacks personal jurisdiction as to the claims of non-Florida putative class members."). Fortunately, that's not the question we must address today.[19] Instead, the question Ford has posed in its Motion is whether *Bristol-Myers* applies to the non-Florida claims of the non-Florida *named* Plaintiffs.[20]

And, on this question, *Bristol-Myers* is instructive because the same due process concerns that animated the Supreme Court's decision in that case apply with equal force to the *named* plaintiffs in a class action. *See* 137 S. Ct. at 1776 ("For a court to exercise specific jurisdiction over a claim there must be an 'affiliation between the forum and the underlying controversy, principally [an] activity or

---

[19] For the strongest articulation of why *Bristol-Myers* does not bar the claims of *unnamed* class members, see Judge Dalton's reasoning in *Tickling Keys, Inc. v. Transamerica Fin. Advisors, Inc.*, which other judges in this Circuit have cited approvingly. *See* 305 F. Supp. 3d 1342, 1350–51 (M.D. Fla. 2018) (explaining why the extension of *Bristol-Myers*—a "multiplaintiff products liability action originally filed in California State court that named both resident and non-resident plaintiffs"—"is still an open question"); *see also Lee v. Branch Banking & Tr. Co.*, 2018 WL 5633995, at *6–7 (S.D. Fla. Oct. 31, 2018) (Scola, J.) (citing *Tickling Keys*); *Becker*, 314 F. Supp. 3d at 1342–45 (citing *Tickling Keys*).

[20] The Plaintiffs' cases (*see* Response at 5) *all* involved the claims of *unnamed* class members—and, for that reason, are wholly irrelevant here. *See In re Takata Airbag Prods. Liab. Litig.*, 396 F. Supp. 3d 1101, 1135 (S.D. Fla. 2019) (Moreno, J.) ("The Court agrees with Plaintiffs, and is persuaded by the growing body of law amongst district courts in this Circuit holding that *Bristol-Myers* does not bar claims of non-resident *members of a putative class* from asserting claims in federal court." (emphasis added & cleaned up)); *Dolan v. Jetblue Airways Corp.*, 385 F. Supp. 3d 1338, 1355 (S.D. Fla. 2019) (noting that *Bristol-Myers* does not bar the claims of non-resident *class members*); *Burke v. Credit One Bank, N.A.*, 2019 WL 1468536, at *6 (S.D. Fla. Feb. 5, 2019) ("District courts within the Eleventh Circuit have found *Bristol-Myers* inapplicable to class actions and rejected the argument, like Credit One's argument here, that *Bristol-Myers* deprives federal courts of personal jurisdiction over defendants as to *non-resident class members*." (emphasis added)); *Goodman v. Sun Tan City, LLC*, 2018 WL 6978695, at *4–5 (S.D. Fla. Dec. 14, 2018) (recommending that the Court deny defendant's motion to dismiss for lack of personal jurisdiction because *Bristol-Myers* does not require dismissal of non-resident *putative class members'* claims (emphasis added)), *report and recommendation adopted*, 2019 WL 1112258 (S.D. Fla. Jan. 8, 2019); *Lee*, 2018 WL 5633995, at *6 (denying motion to dismiss claims of nonresident *putative class members* under *Bristol-Myers*, but dismissing claims of nonresident *named* plaintiffs for lack of specific jurisdiction); *Becker*, 314 F. Supp. 3d at 1344 (denying motion to dismiss *putative class members'* claims under *Bristol-Myers*); *Feldman v. BRP US, Inc.*, 2018 WL 8300534, at *5–6 (S.D. Fla. Mar. 28, 2018) (Dimitrouleas, J.) (rejecting argument that *Bristol-Myers* required dismissal of non-Florida *putative class members'* claims).

an occurrence that takes place in the forum state.'" (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 918 (2011)).

This, at least, was the Northern District of Florida's view in *Howe v. Samsung Electronics America, Inc.*, 2018 WL 2212982, at *2–4 (N.D. Fla. Jan. 5, 2018), which is on all-fours with our case. The *Howe* plaintiffs purchased defective Samsung televisions. *See id.* at *1. When Samsung refused to honor its warranties, the plaintiffs filed a putative class action in the Northern District of Florida. *Id.* As here, while Howe lived and bought his Samsung in Florida, the other named plaintiffs lived and bought their televisions in other states. *Id.* The defendants—again, like Ford—weren't subject to general jurisdiction in Florida. *See id.* at *3 ("The defendants plainly would not be subject to jurisdiction in a Florida court on the claims arising from sales in Washington and Illinois."). The district court thus dismissed the *named*, non-Florida plaintiffs' claims for lack of personal jurisdiction—relying, in part, on the reasoning of *Bristol-Myers*. *See id.* at *2–5 ("*Bristol-Myers* and the other Supreme Court decision[s] rely on the Due Process Clause and trump any contrary view of the Florida courts. In sum, this court lacks personal jurisdiction over the defendants on the claims arising from the sales to Mr. McCallon and the Wares outside of Florida.").

Nor was *Howe* some mere aberration. In fact, since *Bristol-Myers*—and even in the context of class actions—*no court* in this Circuit has exercised personal jurisdiction over the out-of-state claims of out-of-state *named* plaintiffs. *See, e.g.*, *Lee*, 2018 WL 5633995, at *4 (dismissing the claims of three named plaintiffs in a TCPA putative class action for lack of specific jurisdiction because there were "no allegations connecting Lee, Montmimy, or Newman's claims to Florida[,]" "[n]one of those Plaintiffs are Florida citizens[,]" and "it would be unreasonable to infer that the allegedly offending calls to those Plaintiffs were made to or from Florida, or otherwise arose from [defendant's] operations in the state"); *id.* at *4 n.1 ("The Court is also bound to dismiss Lee, Montmimy and Newman's

individual claims under the due process considerations explained by the Supreme Court in *Bristol-Myers Squibb*[.]").[21]

And so, while it may make sense to distinguish the claims at issue in *Bristol-Myers* from the claims of *unnamed* class members, the logic of that distinction falls apart in the context of *named* plaintiffs—whether those named plaintiffs are consolidated in a mass-tort action or as representatives of a nationwide class. *See, e.g.*, *Mussat v. IQVIA, Inc.*, 953 F.3d 441, 447 (7th Cir. 2020) (distinguishing between "the lead plaintiffs [who] earn the right to represent the interests of absent class members" and "absent class members [who] are not full parties to the case for many purposes"); *see also Gibson v. Chrysler Corp.*, 261 F.3d 927, 940 (9th Cir. 2001) ("[A] class action, when filed, includes only the claims of the named plaintiff or plaintiffs."); *cf. Molock v. Whole Foods Mkt. Grp., Inc.*, 952 F.3d 293, 297 (D.C. Cir. 2020) (noting that "putative class members—at issue in this case—are *always* treated as nonparties"). Indeed, as the Seventh Circuit has explained, in reasoning that's fatal to the Plaintiffs' position here, "there is no reason why personal jurisdiction should be treated any differently from subject-matter jurisdiction and venue: the named representatives must be able to demonstrate either general or specific personal jurisdiction, but the unnamed class members are not required to do so." *Mussat*, 953 F.3d at 447.[22] In the end, calling a case a class action doesn't magically absolve the *named* plaintiffs of their obligations to establish personal and subject-matter jurisdiction over the defendants.

---

[21] *See also Starks v. Chuhak & Tecson, P.C.*, 2018 WL 11182715, at *4 (S.D. Fla. Oct. 15, 2018) (Cohn, J.) (dismissing, on a motion for reconsideration, the claims of three named plaintiffs in a putative class action who did not present evidence of personal jurisdiction at a pre-trial evidentiary hearing because "BMS [*Bristol-Myers*] is controlling here" and because, "[u]nder that precedent, each individual Named Plaintiff must establish a connection between his claims and the State of Florida"); *Feldman*, 2018 WL 8300534, at *4–5 (holding, in a putative class action asserting (as here) state-law and Magnuson-Moss claims, that, "[l]ike the claims of the nonresident plaintiffs in *Bristol-Myers Squibb*, Mr. Dickerson's claims arise from conduct that took place completely outside of the forum where he seeks to bring suit. It follows that this Court cannot exercise specific jurisdiction over his claims.").

[22] As we've seen, the Middle District of Florida quoted this language approvingly in reaching a similar conclusion in *Story*. *See* 461 F. Supp. 3d at 1231.

The Plaintiffs' contention that *Bristol-Myers* applies only to state courts (*see* Response at 6) is equally misplaced. The argument appears to stem—though the Plaintiffs don't say so directly—from the last sentence of the Supreme Court's opinion, which "le[ft] open the question whether *the Fifth Amendment* imposes the same restrictions on the exercise of personal jurisdiction by a federal court." *Bristol-Myers*, 137 S. Ct. at 1784 (emphasis added). In saying so, the Court cited footnote 5 of its prior opinion in *Omni*, where it declined to decide whether "a federal court could exercise personal jurisdiction, consistent with *the Fifth Amendment*, based on an aggregation of the defendant's contacts with the Nation as a whole, rather than on its contacts with the State in which the federal court sits." 487 U.S. at 102 n.5 (emphasis added).

The *Bristol-Myers* Court was thus not suggesting that its rule would *never* apply in federal court—only that it might not apply where the federal defendant's due process rights are governed by *the Fifth Amendment*, which (in turn) happens when, for example, the plaintiff has asserted a cause of action under a federal statute that provides for nationwide service of process. *See, e.g.*, *S.E.C. v. Straub*, 921 F. Supp. 2d 244, 253 (S.D.N.Y. 2013) (Sullivan, J.) (noting that, in federal diversity cases—as in state court—"there is no question that the pertinent referent is the Fourteenth Amendment," but adding that, "[w]hen the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process, however, the Fifth Amendment applies").[23] Since Magnuson-Moss does not include a provision for nationwide service of process, *see Bluewater Trading LLC v. Fountaine Pajot, S.A.*, 2008 WL 2705432, at *2 (S.D. Fla. July 9, 2008) ("[T]he

---

[23] *See also S.E.C. v. Carrillo*, 115 F.3d 1540, 1543 (11th Cir. 1997) ("When a district court's subject matter jurisdiction is founded upon a federal question, the constitutional limits of the court's personal jurisdiction are fixed, in the first instance, not by the Fourteenth Amendment but by the Due Process Clause of the Fifth Amendment. Inasmuch as the federalism concerns which hover over the jurisdictional equation in a diversity case are absent in a federal question case, a federal court's power to assert personal jurisdiction is geographically expanded." (quoting *United Elec. Radio and Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1085 (1st Cir. 1992))).

Magnuson-Moss Act does not authorize nationwide service."), *aff'd*, 335 F. App'x 905 (11th Cir. 2009),[24] Ford's personal-jurisdiction protections in this case come from the due process clause of the Fourteenth (not the Fifth) Amendment, *see Straub*, 921 F. Supp. 2d at 253. And the Fourteenth Amendment's due process guarantee, as we've seen, requires a plaintiff to show that his claim arises, not from the defendant's *nationwide* contacts, but from its *state-specific* contacts. *See Walden v. Fiore*, 571 U.S. 277, 283–84 (2014) ("The Due process Clause of the Fourteenth Amendment constrains a State's authority to bind a nonresident defendant to a judgment of its courts. . . . For a state to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State."); *Chew v. Dietrich*, 143 F.3d 24, 28 n.4 (2d Cir. 1998) ("[U]nder the Fourteenth Amendment only the contacts with the forum state may be considered.").[25] Since this is precisely the test the *Bristol-Myers* Court applied—and which the *Bristol-Myers* plaintiffs failed—it's hard to see why a federal court should apply it any differently than a state court would in the circumstances of our case. And, as we've discussed, the non-Florida Plaintiffs fail this test.

More fundamentally, *Omni* made clear that, "[b]efore a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Omni*, 484 U.S. at 104. "[S]ervice of summons is the procedure by which a court having venue and jurisdiction of the subject matter of the suit asserts jurisdiction over the person of the party served." *Mississippi Publ'g Corp. v. Murphree*, 326 U.S. 438, 444–45 (1946). "Thus, before a court may exercise

---

[24] *See also* 15 U.S.C. § 2301, *et seq.* (not affording nationwide service of process).

[25] This difference in the focus of the minimum-contacts test—nationwide versus state-specific—is really the only salient way in which the Fifth and Fourteenth Amendments' due process guarantees differ on the issue of personal jurisdiction. *See, e.g., Carrillo*, 115 F.3d at 1544 ("[T]he applicable forum for minimum contacts purposes is the United States in cases where, as here, the court's personal jurisdiction is invoked based on a federal statute authorizing nationwide or worldwide service of process."); *Chew*, 143 F.3d at 28 n.4 ("[T]he due process analysis is basically the same under both the Fifth and Fourteenth Amendments. The principal difference is that under the Fifth Amendment the court can consider the defendant's contacts throughout the United States, while under the Fourteenth Amendment only the contacts with the forum state may be considered.").

personal jurisdiction over a defendant, there must be more than notice to the defendant and a constitutionally sufficient relationship between the defendant and the forum. There also must be a basis for the defendant's amenability to service of summons." *Omni*, 484 U.S. at 104. The *Omni* Court then framed the issue in a way that undermines the Plaintiffs' efforts to relegate *Bristol-Myers* to a state-court-only rule. As the Court explained:

> The next question, then, is whether there is authorization to serve summons in this litigation. Today, service of process in a federal action is covered generally by Rule 4 of the Federal Rules of Civil Procedure. Rule 4(f) describes where process "may be served." It authorizes service in the State in which the action is brought, or anywhere else authorized by a federal statute or by the Rules.
>
> The "most obvious reference" of this last provision is to Rule 4(e). The first sentence of the Rule speaks to the ability to serve summons on an out-of-state defendant when a federal statute authorizes such service. The second sentence, as an additional method, authorizes service of summons "under the circumstances" prescribed in a state statute or rule. Thus, under Rule 4(e), a federal court normally looks either to a federal statute or to the long-arm statute of the State in which it sits to determine whether a defendant is amenable to service, a prerequisite to its exercise of personal jurisdiction.

*Id.* (cleaned up).[26] In other words, in the absence of a statute or Federal Rule that authorizes nationwide service of process, this Court must enforce the Florida long-arm statute—an exercise that, it goes without saying, impels the federal judge to step into the state court's shoes, as it were. *See Walden*, 571 U.S. at 283 ("Federal courts ordinarily follow state law in determining the bounds of their jurisdiction

---

[26] The Supreme Court decided *Omni* in 1987. Back then, Rule 4(f) handled service *within* the United States. *See* 484 U.S. at 104 n.7 ("All process other than a subpoena may be served anywhere within the territorial limits of the state in which the district court is held, and, when authorized by a statute of the United States or by these rules, beyond the territorial limits of that state." (quoting FED. R. CIV. P. 4(f)). Since then, however, Rule 4 has been amended several times. *See, e.g.*, FED. R. CIV. P. 4(e)–(f) advisory committee's note to 1993 amendment (explaining that, after the 1993 amendments, Rule 4(e) "provides for service of summons on individuals within a judicial district of the United States," and Rule 4(f) "provides for service on individuals who are in a foreign country"). So, while Rule 4(k)(2) responded to the Supreme Court's decision in *Omni*, *see* FED. R. CIV. P. 4(k) advisory committee's note to 1993 amendment (explaining that the amendment responds, in part, to "the suggestion of the Supreme Court made in *Omni Capital*"), *Omni*'s guiding principles remain relevant today, *see De Gazelle Grp., Inc. v. Tamaz Trading Establishment*, 817 F.3d 747, 749–50 (11th Cir. 2016) (Marcus, J.) (quoting *Omni* for the proposition that, before a court may exercise personal jurisdiction over a defendant, the plaintiff must show that the defendant is amenable to service of process under Rule 4).

over persons." (cleaned up) (quoting *Daimler AG*, 571 U.S. at 125)). Again, this equivalence (in a case like ours) between the test a state and federal judge must apply makes it difficult to believe that the federal court's version would involve some different, looser, as-yet-undefined standard. In any case, since the long-arm exercise here has nothing to do with the Fifth Amendment, it doesn't implicate the hypothetical scenario the Court "le[ft] open" at the end of *Bristol-Myers*.[27]

 *Bristol-Myers* thus squarely forecloses the Plaintiffs' pendent-*party* personal-jurisdiction arguments here.

### c. Reason 3: Discretion

 Even if pendent-party personal jurisdiction were applicable here, the decision to exercise it would remain soundly within this Court's discretion. As the Plaintiffs concede, a "district court has *discretion* to exercise personal jurisdiction over a claim that it ordinarily lacks personal jurisdiction over[.]" Response at 7 (emphasis added) (quoting WRIGHT & MILLER, *supra*, § 1069.7); *see also Action Embroidery*, 368 F.3d at 1181 (noting that "the actual exercise of personal pendent jurisdiction in a

---

[27] We note in passing the ongoing debate about whether Magnuson-Moss invests federal courts with federal-question jurisdiction. *Compare MacDougall v. Am. Honda Motor Co.*, 2017 WL 8236359, at *4 (C.D. Cal. Dec. 4, 2017) ("Plaintiffs' argument that the Court can exercise jurisdiction over their Magnuson-Moss Act claim through CAFA is nonsensical."), *and Floyd v. Am. Honda Motor Co. Inc.*, 966 F.3d 1027, 1035 (9th Cir. 2020) ("CAFA may not be used to evade or override the MMWA's specific numerosity requirement."), *with Kuns v. Ford Motor Co.*, 543 F. App'x 572, 574 (6th Cir. 2013) ("To bring a class action pursuant to the MMWA, a complaint must list at least one hundred named plaintiffs. Kuns is the only named plaintiff in her case. However, the court reasons that the CAFA—the more recent of the two statutes—can render a district court a court of competent jurisdiction and permit it to retain jurisdiction where the CAFA requisites are met but the MMWA requisites are not. . . . We agree that the district court had jurisdiction notwithstanding the MMWA's jurisdictional limitations."). This debate, in turn, has led to a related disagreement about whether, if Magnuson-Moss does not confer federal-question jurisdiction, the doctrine of pendent personal jurisdiction even applies to courts sitting in diversity. *Compare Action Embroidery*, 368 F.3d at 1180–81 ("Pendent personal jurisdiction is typically found where one or more federal claims for which there is nationwide personal jurisdiction are combined in the same suit with one or more state or federal claims for which there is not nationwide personal jurisdiction."), *with Allen*, 2018 WL 6460451, at *7 (exercising pendent-party personal jurisdiction in a diversity case over the non-resident named plaintiffs' claims). But, since we've rejected the Plaintiffs' position on other grounds, we needn't wade into these thorny issues here.

particular case is within the discretion of the district court"); *Oetiker v. Jurid Werke, G.m.b.H.*, 556 F.2d 1, 5 (D.C. Cir. 1977) ("Of course, the district court may have discretion to dismiss the pendent claims where considerations of judicial economy, convenience and fairness to litigants so dictate." (cleaned up)). Because the Plaintiffs' pendent-party personal-jurisdiction arguments would require this Court to (needlessly)[28] exercise jurisdiction over parties whose claims have *no* connection to Florida, this Court elects not to exercise its discretion to apply that doctrine here.

### 3.  Argument 3: The Class Action Fairness Act

The Plaintiffs now make a last-ditch appeal to judicial efficiency and argue that Ford's position would undermine Congress's objectives in passing the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). *See* Response at 10 ("Ford's position would effectively extinguish nationwide consumer class actions, in stark contradiction to the purpose of CAFA and Rule 23" and would mean that "a nationwide class action would be replaced by a patchwork of multi-district litigation."). As this Court has already explained—q.v., our discussion on cake-eating—the Plaintiffs' doomsday predictions miss their mark.

In any event, the Plaintiffs are wrong to hitch their wagon to CAFA, which endows the district courts with subject-matter, *not* personal, jurisdiction. *See* 28 U.S.C. § 1332(d)(2) ("The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs" and, in relevant part, is a class action in which "any member of a class of plaintiffs is a citizen of a State different from any defendant."). CAFA, then, doesn't absolve plaintiffs of their constitutional obligation to establish that the exercise of *personal* jurisdiction comports with due process. *See Story*, 461 F. Supp. 3d at 1231 (M.D. Fla. 2020) ("Even in a class action, there is no reason why personal jurisdiction should be treated any differently from

---

[28] We say *needlessly* because, as we discussed above, the Plaintiffs could easily have avoided this whole issue by playing their cards somewhat differently.

subject-matter jurisdiction and venue: the named representatives must be able to demonstrate either general or specific jurisdiction." (cleaned up) (quoting *Mussat*, 953 F.3d at 447)).

***

As this recitation should have made plain, Ford's Motion to Dismiss the non-Florida *named* Plaintiffs' claims (Counts IV–XI) is **GRANTED**.

## II.      FDUTPA (Count II)

In Count II, the Plaintiffs allege that Ford violated Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), *see* FLA. STAT. § 501.201 *et seq.*, when it "omitted disclosure of the known and material fact that the Original and New Dash possess the Defect." SAC ¶ 172; *see also id.* ¶ 168–77.

"[U]nder FDUTPA, the plaintiff must only establish three *objective* elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Carriulo v. Gen. Motors Co.*, 823 F.3d 977, 985–86 (11th Cir. 2016) (citing *City First Mortg. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. 4th DCA 2007)). A FDUTPA claim may arise from a "single unfair or deceptive act[] in the conduct of any trade of commerce, even if it involves only a single party, a single transaction, or a single contract." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003). Under Florida law, "[a]n unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Id.* (cleaned up). And a deception "occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Id.* (cleaned up) (quoting *Millennium Commc'ns & Fulfillment, Inc. v. Off. of the Att'y Gen.*, 761 So. 2d 1256, 1263 (Fla. 3d DCA 2000)).

Ford attacks the Plaintiffs' FDUTPA claim for failing to meet the heightened pleading requirements of Rule 9(b)—which, Ford submits, apply to omission and concealment claims no less

than to assertions of affirmative misrepresentation. *See* Motion at 9. As Ford concedes in its Reply,[29] however, Rule 9's more stringent standard doesn't apply to *all* FDUTPA claims—only to those that sound in fraud.[30] The Florida legislature, after all, enacted FDUTPA "to provide remedies for conduct outside the reach of traditional common law torts such as fraud." *Galstaldi v. Sunvest Communities USA LLC*, 637 F. Supp. 2d 1045, 1058 (S.D. Fla. 2009) (cleaned up). A plaintiff thus need not "prove the elements of fraud to sustain an action under the statute." *Id.* At the same time, "courts regularly apply Rule 9(b) to FDUTPA claims, as such claims uniquely sound in both tort and fraud." *USA Nutraceuticals Grp. Inc. v. BPI Sports, LLC*, 2016 WL 4254257, at *3 (S.D. Fla. Feb. 16, 2016) (cleaned up). The upshot is that, where a FDUTPA claim is premised on an underlying fraud, the plaintiff must satisfy the strictures of 9(b). On the other hand, when the FDUTPA claim is "based on deceptive or unfair practices that do not involve fraud," the cause of action "need not be pled with particularity." *Id.*

There is, of course, a separate line of cases in which courts have *categorically* refused to hold FDUTPA claims to the rigors of 9(b). *See, e.g.*, *Harris v. Nordyne, LLC*, 2014 WL 12516076, at *4 (S.D. Fla. Nov. 14, 2014) ("One line of cases hold that Rule 9(b) applies to the extent that the FDUTPA claim at issue is based in fraud. This Court joins several decisions in holding that the requirements of

---

[29] *See* Reply at 7 (conceding that 9(b) "may not apply to *some*" FDUTPA claims but maintaining that "it does apply to" the Plaintiffs' FDUTPA claim).

[30] Nor do Ford's cases support the proposition that 9(b) applies to *all* FDUTPA claims. *See Padilla v. Porsche Cars N. Am., Inc.*, 391 F. Supp. 3d 1108, 1113–15 (S.D. Fla. 2019) (holding that plaintiffs "fail[ed] to allege with sufficient particularity any claims of fraudulent concealment"—which does trigger 9(b)'s pleading requirements—so as to toll the statute of limitations on a time-barred FDUTPA claim and refusing to "address the sufficiency of Plaintiffs' FDUTPA claims at this time"). In fact, some of these cases don't concern FDUTPA at all. *See Brooks v. Blue Cross & Blue Shield*, 116 F.3d 1364, 1371–81 (11th Cir. 1997) (per curiam) (affirming district court's order granting the defendants' motion for summary judgment in a putative class action under the Medicare Secondary Payer Act ("MSP"), 42 U.S.C. § 1395y(b), and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, *only* on the district court's reasoning that the plaintiffs failed to show that the defendants provided a "group health plan" as required by the MSP—and *not* on the ground that the plaintiffs had failed to plead a RICO claim with Rule 9(b)'s required specificity).

Rule 9(b) categorically do not apply to claims under FDUTPA." (cleaned up)). And there's much to be said for this position. But we need not decide today whether 9(b) applies to some, all, or no FDUTPA claims—just as we don't need to explain whether 9(b) governs the particular FDUTPA claim the Plaintiffs have asserted here—because, whether under Rule 8 or 9(b), the Plaintiffs' FDUTPA claim survives.

A complaint satisfies Rule 9(b) if it "plead[s] the who, what, when, where, and how of the allegedly false statements and then allege[s] generally that those statements were made with the requisite intent." *Mizarro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008); *see also FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011) (explaining that a complaint satisfies Rule 9(b) if it sets out: "(1) precisely what statements were made in which documents or oral representations; and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud." (cleaned up)).

Ford offers four arguments for its assault on the Plaintiffs' FDUTPA claim—all unpersuasive.

*First*, Ford says that the Plaintiffs have failed to explain what Ford knew, when Ford knew it, or what Ford disclosed to them. *See* Motion at 10. Not so. The SAC unambiguously outlines precisely what Ford should have disclosed—the Defect, *see* SAC ¶¶ 1–97—and when Ford knew about it—since at least 2015, *id.* ¶¶ 120–28.

*Second,* Ford suggests that, because the Defect had become public, Ford had no duty to disclose it. *See* Motion at 10–11. But public *allegations* about the Defect (*see* SAC ¶¶ 121, 132, 138) aren't the same as Ford's independent *knowledge* of the Defect. People accuse other people (and companies) of doing, or not doing, things all the time. If Ford knew about the Defect—as the Plaintiffs allege—then, putting aside the presence of a few-dozen public complaints about the Defect, Ford had a duty to

disclose it. At the very least, Ford's (alleged) knowledge that the complaints were true—*viz.*, that there *was* a Defect—was very much *not* in the public domain. In any event, the Plaintiffs also claim that Ford withheld other material information relating to the Defect, including (1) the 2018 Special Service Message ("SSM")—in which Ford described the Defect to its *dealers* (but not to consumers) and instructed them *not* to repair it, *id.* ¶ 4; (2) the 2019 bulletin—by which Ford authorized its *dealers* to replace the Original Dash with a New Dash, *id.* ¶ 5; (3) Ford's understanding that the New Dash wouldn't fix the Defect, *id.* ¶¶ 117, 129–31; and (4) Ford's unwillingness to remedy the Defect by simply installing the non-defective dashboards it used on more expensive F-150 trims, *id.* ¶¶ 5, 8, 115–18, 131. Taken together, these allegations are more than enough at this stage of the case.

*Third*, Ford lambasts the Plaintiffs for failing to aver that Ford's omission was likely to deceive a reasonable purchaser. *See* Motion at 11–12. "Under Florida law, an objective test is employed in determining whether the practice was likely to deceive a consumer acting reasonably. That is, a party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue." *Carriulo*, 823 F.3d at 983 (cleaned up); *see also Davis v. Powertel, Inc.*, 776 So. 2d 971, 973 (Fla. 1st DCA 2000) ("[T]here is a critical difference between a deceptive trade practice claim and a claim of fraud. A party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue."). Here, Ford seems to believe that the Defect isn't material because its manifestation affects only the trucks' aesthetic—and not their performance. *See* Motion at 9, 12. But materiality is generally a question best left for the jury. *See Air Wis. Airlines Corp. v. Hoeper*, 571 U.S. 237, 258 (2014) ("[M]ateriality is the sort of mixed question of law and fact that has typically been resolved by juries. The jury has a vital role to play in the materiality inquiry, which entails delicate assessments of the inferences a reasonable decisionmaker would draw from a given set of facts and the significance of those inferences to him and is therefore peculiarly one for the trier of fact." (cleaned up)); *see also McLanahan v. Universal Ins. Co.*, 26 U.S. 170, 188 ("[G]enerally, the materiality of the

concealment is a question of fact for the jury."). And there are plenty of questions for a jury to answer here. Most obviously, it doesn't seem unreasonable to suppose that your average American wouldn't pay $50,000 (or more) for a car—as some of our Plaintiffs have—without caring a not-insignificant amount about the aesthetics of the thing. If the average consumer does care about the trucks' aesthetics—and the persistence of these Plaintiffs in getting their defective dashes repaired suggests that *they* (at least) cared a great deal—then it's not hard to imagine him insisting on paying *less* for a truck that's (as it were) aesthetically impaired. The delta, then, between what the average consumer was willing to pay for the truck he thought he was getting—aesthetics included—and the truck he actually got is, of course, the amount by which that average consumer was "deceived."

*Fourth*, Ford maintains that the Plaintiffs have failed to allege that Ford "actively concealed" the Defect. *See* Motion at 12. But, while allegations of active concealment may bolster a FDUTPA claim, they are (as Ford wisely conceded at oral argument) unnecessary. *See Carriulo*, 823 F.3d at 983 ("The elements comprising a consumer claim for damages under FDUTPA are: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages."). Since active concealment is not an element of a FDUTPA claim, the Plaintiffs can't be blamed for having failed to include it. Even so, the SAC is replete with allegations of active concealment. *See, e.g.*, SAC ¶¶ 3–10, 115–21, 128–31, 141–42.

Ford's Motion to Dismiss the Plaintiffs' FDUTPA claim (Count II) is therefore **DENIED**.

## III.    Breach of Express Warranty (Count III)

Ford also contends that the Plaintiffs failed to plead a viable breach-of-warranty claim (Count III). *See* Motion at 12. "Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." FLA. STAT. § 672.313(1)(a). "Statements made in promotional materials, advertisements, and brochures may be sufficient to create an express warranty if the buyer relies on those statements in making his purchase[,]" but "mere puffery or sales talk is not

sufficient to create an express warranty." *Aprigliano v. American Honda Motor Co., Inc.*, 979 F. Supp. 2d 1331, 1341 (S.D. Fla. 2013).[31]

Ford advances only one argument in its challenge to Count III—that "most of the plaintiffs do not allege they gave Ford an opportunity to repair or replace their dashboards," and that "none of the Plaintiffs' allegations shows that Ford would not or could not reasonably repair the defect within a reasonable number of attempts." Motion at 15–16. This argument fails for two reasons.

*First*, the SAC makes pellucid that the Florida Plaintiffs—the only ones left—*did* give Ford a chance to repair or replace their dashboards. *See* SAC ¶¶ 17–26, 27–33, 36–54, 87–97. In fact, three of the Florida Plaintiffs—Linderman, Glass, and Wooding—allowed Ford to replace their Original Dashes, and one (Wooding) even had his dashboard replaced *twice*. *See id.* ¶¶ 36–54, 87–97. At the very least, every Florida Plaintiff informed an authorized Ford dealer about the Defect and requested warranty coverage. Carter, for instance, "initially contacted Plantation Ford and informed the service manager of the Defect[,]" then "contacted Ford through their website where he filed a report disclosing the defect[,]" and eventually "was told by the service manager [at Plantation Ford] that there was nothing they could do and they were waiting for Ford to issue a recall." SAC ¶¶ 22–24. Siracuse "contacted Bill Jarret Ford and informed the salesman of the Defect. Initially, the dealership refused to make any effort to repair the Defect[.]" *Id.* ¶ 32. Siracuse went back and forth with Bill Jarret Ford about repairing the Defect and eventually took the truck to his local Ford dealer, where a representative told him that there was "[n]o fix at this time." *Id.* Linderman contacted his Ford dealer, who told him that, according to Ford, there was no available remedy. *See id.* ¶ 42. Months later, Linderman heard about the New Dash and scheduled a repair, but "within two weeks the Defect

---

[31] "A claim for breach of an express warranty generally requires the parties to have contractual privity." *Aprigliano*, 979 F. Supp. 2d at 1340. The Plaintiffs say that they "have had sufficient direct dealings with either Ford or its agents (*e.g.*, dealerships and technical support) to establish privity of contract," SAC ¶ 161, and Ford doesn't dispute this point, *see* Motion at 15–16.

manifested again." *Id.* ¶ 42. Glass "reached out to the service department of Alan Jay Ford about his warping Original Dash" and scheduled a replacement, but "[s]everal weeks after installation, [Glass] noticed that the New Dash was warping." *Id.* ¶¶ 50–51. Glass again informed his Ford dealer, who "denied warranty coverage and offered no solution," and later contacted a Ford customer service rep, who instructed him to take his truck back to the dealer. *Id.* ¶ 52. When Glass did so, however, the service advisor "said that another replacement would be pointless because any replacement would also warp and that the vehicle could develop rattles that the dealership would be unable to repair." *Id.* Wooding contacted a Ford dealer several times about the Defect and was told to call Ford's national customer service line. *Id.* ¶¶ 92–93. Wooding received a New Dash that "immediately experienced the Defect again," so he *again* contacted his Ford dealer, who *again* told him to call Ford's national customer service line, where a different Ford rep *again* agreed to replace the dashboard. *Id.* ¶ 94. Unfortunately, Wooding's "second New Dash immediately experienced the Defect yet again, so [Wooding] once again contacted Ford's national customer service line seeking warranty coverage for the Defect[.]" *Id.* ¶ 95. "At that point, [Wooding] was informed that Ford would not assist [him] with any further repairs." *Id.* How many more chances does Ford get?

*Second*, "[w]hether a warranty fails of its essential purpose is a fact question," and "a party must only make some allegations of fact, if taken as true, [to] suggest that defendant's limited remedies were inadequate and failed of their essential purpose." *Barnext Offshore, Ltd. v. Ferretti Grp. USA, Inc.*, 2012 WL 1570057, at *10 (S.D. Fla. May 2, 2012). The Florida Plaintiffs repeatedly allege that Ford's limited remedy—the New Dash—carried precisely the same Defect as the old one. *See* SAC ¶¶ 33, 42, 50–52, 93–95, 113–28. Time and again, in fact, the SAC claims that Ford and its authorized dealers admitted that the Defect couldn't be fixed. *See id.* ¶¶ 23, 32–33, 51–52, 82. These detailed allegations are plainly sufficient to "suggest that defendant's limited remedies were inadequate and failed of their essential purpose." *Barnext*, 2012 WL 1570057, at *10.

Ford's Motion to Dismiss Count III is therefore **DENIED**.

### IV.    Magnuson-Moss (Count I)

The Magnuson-Moss Warranty Act ("MMWA") "allows consumers to enforce written and implied warranties in federal court, borrowing state law causes of action." *Id.* at *13.

Ford challenges the Plaintiffs' MMWA claim (Count I) on two grounds. *First*, Ford says, the MMWA claim is coextensive with the underlying state warranty claim (Count III), which (as we've seen) Ford thinks this Court should dismiss. *See* Motion at 16. But the Court has *denied* Ford's Motion to Dismiss the underlying warranty claim, which is reason enough to reject this first challenge to Count I. *See, e.g., Ocana v. Ford Motor Co.*, 992 So. 2d 319, 324 (Fla. 3d DCA 2008) ("[T]he question whether a warrantor has committed a breach of a limited express warranty under the [MMWA] is governed by state law." (cleaned up)); *Burns v. Winnebago Indus., Inc.*, 2012 WL 171088, at *4 (M.D. Fla. Jan. 20, 2012) ("Because Plaintiff['s] breach of express warranty claim under Florida's UCC fails, [his] breach of express warranty claim under the MMWA necessarily fails also." (cleaned up)).

*Second*, Ford insists that the Plaintiffs have failed to comply with the informal dispute-resolution mechanism Congress created when it passed the MMWA. *See* Motion at 17. But a plaintiff's (alleged) non-participation in the MMWA's informal dispute-resolution process is "an affirmative defense—subject to waiver, tolling, and estoppel, that Ford may raise, not that Plaintiff must negate in her Complaint." *Sanchez-Knutson v. Ford Motor Co.*, 52 F. Supp. 3d 1223, 1235 (S.D. Fla. 2014). As this Court has explained in rejecting a virtually identical motion filed by this same defendant, "[w]hile participation in Ford's informal dispute settlement procedure is a prerequisite to being able to proceed with her MMWA claim, whether or not it already occurred is an issue of fact that is premature at this stage." *Id.* The Court agrees with Judge Dimitrouleas's well-reasoned opinion in *Sanchez-Knutson*. And, since Ford has offered no other basis for dismissing the MMWA claim, its Motion to Dismiss Count I is **DENIED**.

***

After careful review, the Court hereby **ORDERS AND ADJUDGES** that Ford's Motion to Dismiss [ECF No. 71] is **GRANTED in part** and **DENIED in part** as follows:

1. The Motion to Dismiss Counts IV–XI for lack of personal jurisdiction is **GRANTED**.

2. The Motion to Dismiss Counts I, II, and III for failure to state a claim is **DENIED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 26th day of March 2021.

_____

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record